CENTURY FEDERAL, INC., a California corporation, Plaintiff,

v.

CITY OF PALO ALTO, CALIFORNIA, a municipal corporation; City of Palo Alto Utilities, a municipal utility; City of Menlo Park, California, a municipal corporation; and Town of Atherton, California, a municipal corporation, Defendants.

No. C–83–4231 EFL.

United States District Court,
N.D. California.

Feb. 15, 1984.

Michael Small, Seattle, Wash., and Nicholas P. Miller, Kermit W. Almstedt, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., for plaintiff.

Diane M. Lee, City Atty., Palo Alto, Cal., and Harold R. Farrow, Farrow, Schildhause, Wilson & Rains, Oakland, Cal., John D. Jorgenson, City Atty., Menlo Park, Cal., Robin Faisant, County Atty., Palo Alto, Cal., for defendants.

## OPINION AND ORDER

LYNCH, District Judge.

This matter is before the Court on the defendants' motion to dismiss the complaint. The plaintiff asserts antitrust and First Amendment claims as well as a state free expression claim and state law claims for interference with a right to use dedicated utility poles. Upon considering the briefs and argument of counsel, the Court hereby grants defendants' motion to dismiss as to the antitrust claims and denies the motion as to the free expression and dedication claims.[1]

## I.  FACTS [2]

The plaintiff is an aspiring cable television (hereinafter "CTV") operator. The defendants (hereinafter "the Cities") are three municipalities and a utility company owned by one of the Cities. Plaintiff attempted to enter the CTV business in each of the Cities but was refused a business license and was told that it must participate in a franchisee selection process conducted by the City of Palo Alto on behalf of all of the Cities. Plaintiff also sought permission to use utility poles owned by the Pacific Telephone and Telegraph Company, the Pacific Gas and Electric Company, and the defendant City of Palo Alto Utilities, but was refused "pole attachment services" because it had no CTV operating franchise. Although plaintiff alleges that Pacific Telephone and Telegraph Company and the Pacific Gas and Electric Company are in conspiracy with the defendants, plaintiff has neither developed this allegation nor sued the two companies.

The franchisee selection process conducted by the Cities has two parts. First, the Cities issued a Request for Proposals (hereinafter "RFP"). This document specifies the minimum requirements that an applicant must meet in order to be considered for a franchise.[3] The RFP also requests certain technical, construction, ownership, and financial information concerning the applicant and its proposed system. The

1. The parties do not assert any differences between plaintiff's First Amendment rights and its rights under Article I, Section 2 of the California Constitution; the Court will therefore discuss both claims in First Amendment terms only.

2. For purposes of this motion to dismiss, the Court, of course, accepts the plaintiff's allegations as true.

3. Such minimum requirements include
    a.  payment of a $5000 filing fee,
    b.  reimbursement of the Cities for all actual expenses of the franchising process,
    c.  contribution of approximately $200,000 as a "start-up" endowment (plus a "modest" annual contribution) for a local access organization,
    d.  payment of a percentage of the franchisee's gross revenues,
    e.  provision of the full range of service categories made possible through state-of-the-art ca-

ble technology, including interactive (two-way) service,
    f.  provision of at least 108 channels and three parallel cable systems,
    g.  provision of free basic service and receiving equipment for each public building,
    h.  provision of "an appropriate percentage of the bandwidth" of an "institutional cable" for free use by governmental and other public institutions,
    i.  contributions of facilities (including mobile production units), equipment, staff, and training to aid the public in producing "local access programming,"
    j.  provision of an "appropriate number of channels on the subscriber cable" for local access programming, and
    k.  the waiver of any rights created by law that are contrary to or inconsistent with the RFP or the franchise agreement.

Cities will then evaluate the applicants in a number of categories, including services and rates, technical/construction, financial, local commitment, and ownership/structure.

The second phase of the selection process involves negotiations with one or more of the most qualified applicants. The Cities may award franchises to one or to several bidders, as they see fit, or they may negotiate for municipal participation in the ownership of the system. Plaintiff alleges that this second phase is designed to wring further concessions out of the remaining applicants.

Rather than participate in the franchising process, plaintiff brought this lawsuit, which challenges not just particular aspects of the process, but the very concept of municipal CTV franchising. Plaintiff seeks damages as well as declaratory and injunctive relief. Plaintiff argues that it has a First Amendment right to be a CTV operator and that the franchising process impermissibly burdens that right. Plaintiff also argues that the franchising process is anticompetitive and that market forces, not municipal governments, should decide who can set up a CTV system.

## II. THE ANTITRUST CLAIMS

The Cities assert that their franchising process is protected from antitrust scrutiny under the state action exemption first applied in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Cities also argue that their conduct constitutes neither a Sherman Act section 2 violation nor a section 1 conspiracy, that the issues are not ripe, and that plaintiff lacks constitutional and antitrust standing. As we conclude that defendants' conduct is protected as state action, we do not reach their substantive antitrust arguments.[4]

### A. The State Action Exemption—Preliminary Considerations

The state action "exemption" is a doctrine of federalism;[5] it is premised on the proposition that a state should be free to replace competition with regulation or public ownership without incurring antitrust liability. In *Parker,* the plaintiffs challenged a California statute under which state officials maintained prices and restricted competition among raisin growers. The Supreme Court found that the program was not subject to the antitrust laws because "nothing in the language of the Sherman Act or in its history ... suggests that its purpose was to restrain a state or its officers from activities directed by its legislature." *Id.* 317 U.S. at 350–51, 63 S.Ct. at 313–14. The Court emphasized the sovereignty of the states and refused to infer that Congress intended to nullify a state's control over its officers and agents.

A city, however, is not a sovereign body and cannot be the *source* of a *Parker* exemption. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (plurality opinion of Brennan, J.).[6] *City of Lafayette* involved a challenge to allegedly anticompetitive conduct by two municipal utilities. In affirming the circuit court's remand of

4. Defendants' ripeness and constitutional standing arguments lack merit for the reasons discussed in Part III.A. of this opinion. Defendants' antitrust standing argument is also unavailing. *Solinger v. A & M Records,* 586 F.2d 1304 (9th Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979), makes clear that preparedness to enter the market is a factual issue. *Id.* at 1309–10. The *Solinger* court noted that this issue seldom presents a situation appropriate for *summary judgment. Id.* at 1310. On this *motion to dismiss,* the Court certainly cannot reject plaintiff's allegations that it is prepared to enter the market.

5. The state action doctrine does not truly "exempt" or "immunize" conduct from the cover-

age of the antitrust laws; rather, it rests on a construction of the Sherman Act that places certain activities beyond the reach of the statute.

6. This proposition commanded a clear majority of the Court in *Community Communications Corp. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); it should be noted, however, that *City of Boulder* concerned only injunctive relief. *See City of Lafayette,* 435 U.S. at 441–43, 98 S.Ct. at 1151–52 (1978) (dissenting opinion of Blackmun, J.); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 614 n. 6, 96 S.Ct. 3110, 3129 n. 6, 49 L.Ed.2d 1141 (1976) (opinion of Blackmun, J., concurring in the judgment).

the case, the Supreme Court stated that the conduct of the cities would be exempt only if engaged in pursuant to state policy to displace competition with regulation or monopoly public service. Moreover, the test of the adequacy of the state mandate for anticompetitive conduct by the city is not whether the city can point to a specific, detailed legislative authorization, but whether it is shown "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." *Id.* 435 U.S. at 415, 98 S.Ct. at 1138.

In *California Liquor Dealers' Ass'n. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court crystallized a two-part test from its earlier opinions in *City of Lafayette* and *Bates v. Arizona State Bar*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion of Brennan, J.)). *Midcal* involved California's statutory plan for wine pricing, which required the filing of fair trade contracts or price schedules with the state. Wholesalers who departed from the listed prices were penal-

ized by the state. The program passed the first part of the test because it was embodied in a statute. However, the program was impaled on the second prong, requiring active supervision by the state, because the state did not establish or review the price schedules themselves.

The crucial issues in the instant case concern the interpretation and application of the *Midcal* test to allegedly anticompetitive conduct *by a municipality*. First, is the clear articulation part of the *Midcal* test satisfied when the state *authorizes* a municipality to act anticompetitively, or must the state *compel* such anticompetitive action? Second, does the active supervision part of the *Midcal* test apply at all when the challenged activity is conducted by a municipality rather than by private parties?

### B. *Midcal*'s "Clear Articulation" Test

#### 1. California's Statutory Scheme

■ The Court finds that sections 53066 and 53066.1 of the California Government Code *authorize* franchising such as that conducted by the Cities despite any anticompetitive effects.[7] Those statutes do not, however, *require* or *compel* such allegedly anticompetitive procedures. The plain language of section 53066 is thor-

---

**7.** Section 53066, which was enacted in 1963 and amended in 1968, provides, in pertinent part, as follows:

> Any city or county or city and county in the State of California may, pursuant to such provisions as may be prescribed by its governing body, authorize by franchise or license the construction of a community antenna television system. The award of the franchise or license may be made on the basis of quality of service, rates to the subscriber, income to the city, county or city and county, experience and financial responsibility of the applicant plus any other consideration that will safeguard the local public interest, rather than a cash auction bid.

Section 53066.1 was enacted in 1979 and was amended twice in 1982; it permits a CTV operator to escape municipal *rate* regulation if it meets certain criteria. It does not deregulate or in any way relate to franchising. Moreover, subsection (p) states as follows:

> While the development and the regulation of cable television is a matter of statewide con-

cern, the Legislature finds and directs that the exercise of the police power of the State of California concerning cable television should, except as otherwise directed by the Legislature, remain in the cities, counties, or cities and counties; and that the cable television companies and the cities, counties, or cities and counties should remain able, subject to the proper limits of that police power, to contract one with the other pursuant to the ordinary rules of, and subject to the ordinary remedies of contract law; except that henceforth neither a cable television system nor a franchisor shall be entitled, with respect to any franchise agreement awarded or renewed on or after the effective date of amendments to this section enacted by the Statutes of 1982, to raise the defense of impairment of contract, in any case where the due and proper exercise of the police power, or the limits thereof, is at issue, and a provision to this effect shall be deemed to be incorporated in any such franchise agreements.

oughly permissive; a city may, under a local public interest standard, award a franchise to any one party or to many parties, and it may consider any relevant factor. Plaintiff contends that the Cities must give a franchise or license to any party seeking one; the statute does not require a city to do this or in any other way to safeguard free competition. Indeed, the word "franchise" connotes a certain degree of exclusivity, and the right of a city to *deny* a franchise was necessarily upheld in *Monarch Cablevision, Inc. v. City Council of Pacific Grove*, 239 Cal.App.2d 206, 48 Cal.Rptr. 550 (1966).

At oral argument, plaintiff contended that despite the plain language of section 53066, the California legislature did not delegate franchising authority *with an intent to displace competition*. After reviewing the lengthy excerpts of legislative history presented by the parties, the Court concludes that the legislature did intend to displace competition when it enacted section 53066.

It is true that the legislative history never refers specifically to the displacement of competition. Nevertheless, the legislature must have considered that granting municipalities the authority to award franchises on virtually any basis that they deem advisable would necessarily displace the competitive free-for-all argued for by the plaintiff. Indeed, one purpose of the bill was to make it clear that a city was not required to award a franchise to the highest bidder. Danielson and Wheeler, *The Status of the Cable Antenna Television Industry in California and a Proposal for State Regulation*, 2 Pacific L.J. 528, 551–54 (1971). Moreover, the enactment of section 53066.1 was a step toward competition in CTV rate-setting; this was necessary because rates had been regulated under section 53066. Yet section 53066.1 deregulated nothing but CTV rates, and the legislature did so because it felt that competition *from non-cable sources* would keep CTV rates in

check. California Office of Planning and Research, Enrolled Bill Report: AB 699 at 3 (Sept. 20, 1979). The Court finds nothing in the legislative history that contradicts the plain language of the statute, and the Court concludes that California's municipalities *may*, but are not required to, franchise in a way such that some potential CTV operators are excluded from the local market.

### 2. Compulsion Versus Authorization

In *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Supreme Court held that CTV regulation by a home rule city was not exempt as state action because, in the absence of "an affirmative addressing of the subject by the State," the state's position was "one of mere *neutrality.*" *Id.* at 55, 102 S.Ct. at 842. Plaintiff argues that state compulsion must be required in this case because mere authorization is equivalent to the neutrality found in *City of Boulder*. Where each municipality is free to choose between competition, regulation, and municipal ownership, plaintiff argues, the legislature cannot be held to have "contemplated" each approach.

The Court disagrees. This case is unlike *City of Boulder* because here the legislature has *affirmatively addressed* the subject. *See, e.g., Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1013 (8th Cir.1983), *appeal pending*. Section 53066 gives municipalities the power to award a franchise (or franchises[8]) "on the basis of quality of service, rates to the subscriber, income to the city ..., experience and financial responsibility of the applicant plus any other consideration that will safeguard the local public interest, rather than a cash auction bid."[9] Thus, it can be said, "from the authority given [the Cities] to [franchise CTV] that the legislature contemplated the kind of action complained of." *City of Lafayette*, 435 U.S. at

---

**8.** The term "franchise" includes the plural form "franchises." Cal.Gov't Code § 13.

**9.** Section 9–506 of the Arizona Revised Statutes contains no similar provision. Arizona did not

affirmatively address the issue of municipal CTV regulation with the specificity that has been done here. This case is thus distinguishable from *Catalina Cablevision Assoc. v. City of Tucson*, No. 82–459 (D.Ariz. July 2, 1983).

415, 98 S.Ct. at 1138 (plurality opinion of Brennan, J.). This interpretation of *City of Lafayette* and *City of Boulder* is further supported by the fact that the language of both cases refers to whether the state "directed or authorized" the action complained of. *City of Lafayette*, 435 U.S. at 414, 416, 417, 98 S.Ct. at 1137, 1138, 1139; *City of Boulder*, 455 U.S. at 57, 102 S.Ct. at 844.

State and local governments would be in a difficult bind were authorization to displace competition insufficient to invoke the state action exemption. In some areas, a state may decide that proper use of the delegated powers requires wide discretion and flexibility at the local level. *Cf. City of Lafayette*, 435 U.S. at 416, 98 S.Ct. at 1138; Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv. L.Rev. 435, 445 n. 49 (1981). In fact, the clearest articulation and the most affirmative expression of state policy in this area is contained in California Government Code section 53066.1(p), which reaffirms as follows the authority granted by section 53066: "the Legislature finds and directs that the exercise of the police power of the State of California concerning cable television should, except as otherwise directed by the Legislature, remain in the cities, counties, or cities and counties ...." The position of the State of California is that choices involving CTV regulation are best made at the local level. When problems arise with local regulation, the state will step in to correct them, as it did in 1979 by deregulating some CTV rates under section 53066.1. A state should not be *forced* to choose, on behalf of each municipality, between free competition, regulation, and municipal ownership.

The Seventh and Eighth Circuits have squarely faced the compulsion versus authorization question and have clearly held that state authorization (with an intent to displace competition) is sufficient to confer state action immunity upon a municipality. *Town of Hallie v. City of Eau Claire*, 700 F.2d 376 (7th Cir.1983) (municipal monopolization of markets for sewage collection, transportation, and treatment), *appeal pending; Gold Cross Ambulance &*

*Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983) (single-operator ambulance system), *appeal pending; see also Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency*, 715 F.2d 419 (8th Cir.1983) (municipal monopolization of solid waste disposal services). Two other circuits have, in less explicit terms, immunized municipal action that was authorized, though not compelled, by the state. *City of North Olmsted v. Greater Cleveland Regional Transit Authority*, 722 F.2d 1284 (6th Cir.1983) (municipal monopolization of regional public transportation); *Pueblo Aircraft Service, Inc. v. City of Pueblo*, 679 F.2d 805 (10th Cir.1982) (municipal regulation of aircraft services), *cert. denied*, —— U.S. ——, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983). In addition, a number of district courts have opted for the authorization standard. *E.g., Springs Ambulance Service v. City of Rancho Mirage*, 1983–2 Trade Cas. (CCH) ¶ 65, 646 (C.D.Cal. Sept. 27, 1983) (municipal monopolization of emergency ambulance services); *Golden State Transit Corp. v. City of Los Angeles*, 563 F.Supp. 169 (C.D.Cal.1983) (municipal regulation of taxicab services; court noted that such regulation was "traditionally local"); *Hybud Equipment Corp. v. City of Akron*, 1983–1 Trade Cas. (CCH) ¶ 65, 356 (N.D. Ohio April 6, 1983) (municipal monopolization of solid waste disposal services); *see Hopkinsville Cable TV, Inc. v. Pennyroyal Cablevision, Inc.*, 562 F.Supp. 543 (W.D. Ky.1982) (award of cable TV franchise; cable TV was, however, a "public utility" under state law).

The Court recognizes that interpreting the *Midcal* test to require only authorization (with intent to displace competition) for municipal action is not without problems. Current Supreme Court precedents appear to require compulsion where *non-municipal* governmental agencies such as state bar committees are concerned. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975); *Bates v. State Bar of Arizona*, 433 U.S. 350, 360, 97 S.Ct. 2691, 2697, 53 L.Ed.2d

810 (1977). The Ninth Circuit has followed this interpretation in *Ronwin v. State Bar of Arizona*, 686 F.2d 692, 696 (9th Cir. 1981), *cert. granted sub nom. Hoover v. Ronwin*, —— U.S. ——, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983).

In neither *City of Lafayette* nor *City of Boulder* did the Supreme Court articulate a distinction between municipalities and other non-sovereign governmental bodies. Nevertheless, this Court finds the language of *City of Lafayette* to be irreconcilable with the compulsion test used in *Goldfarb* and *Bates*. We believe that such a distinction can be drawn, at least where the political accountability of municipal officials can serve to check governmental excesses.

The Supreme Court warned in *City of Lafayette*, 435 U.S. at 406–08, 98 S.Ct. at 1133–34 (plurality opinion of Brennan, J.), that cities may often pursue their own parochial interests and that municipal actions may affect persons who lack political recourse because they live outside the municipality. As the instant case involves no such effects, the local interests of the Cities will not be served at the expense of surrounding municipalities. Moreover, the political accountability of the municipal officials will insure that the *local* public interest is served; this is precisely what is contemplated by sections 53066 and 53066.-1(p) of the California Government Code.

Even if *Goldfarb* and *City of Lafayette* could not be so harmonized, we would still adopt the authorization test for municipal defendants.[10] To the extent that there exists any conflict between *Goldfarb* and

*Bates* on the one hand and *City of Lafayette* on the other, this Court believes that the language of *City of Lafayette* more accurately states the current view of the Supreme Court on this issue. The *Ronwin* case has already been argued in the Supreme Court and may give the Court an opportunity to clarify the relationship between *Goldfarb* and *City of Lafayette*. On the cases as they now stand, however, we decline to apply *Goldfarb*, *Bates*, and *Ronwin* to the case before us.[11]

The Court therefore concludes that the first part of the *Midcal* test is met—the Cities' plan to franchise one or more CTV operators (or to negotiate for municipal participation in CTV system ownership) is "clearly articulated and affirmatively expressed as state policy." *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943.

### C.  *Midcal*'s "Active Supervision" Test

The second prong of the *Midcal* test is that the challenged policy "must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135 (plurality opinion of Brennan, J.)). The *Midcal* Court applied this requirement to conduct by *private* parties. However, the Court in *City of Boulder* left open the question of whether this requirement applies to *municipal* defendants.[12] We conclude that *Midcal*'s active supervision requirement does not apply in this case.

A number of cases since *City of Boulder* have held that, at least where traditional municipal functions are concerned, active

---

**10.** It is tempting to distinguish *Goldfarb* as a case involving no governmental body at all, for the *Goldfarb* Court concluded that the State Bar "has voluntarily joined in what is essentially a private anticompetitive activity...." 421 U.S. at 792, 95 S.Ct. at 2015. That interpretation, however, was foreclosed in *City of Lafayette*, 435 U.S. at 411–12 n. 41, 98 S.Ct. at 1136–37 n. 41 (plurality opinion of Brennan, J.).

**11.** We also decline to follow *Televents, Inc. v. City of Martinez*, No. C–81–2376 (N.D.Cal. Oct. 23, 1981), which held that sections 53066 and 53066.1 of the California Government Code do not satisfy the first part of the *Midcal* test.

*Televents* preceded *City of Boulder* and gave the entire state action question only summary consideration.

**12.** The Court stated that "[b]ecause we conclude in the present case that Boulder's moratorium ordinance does not satisfy the 'clear articulation and affirmative expression' criterion, we do not reach the question whether that ordinance *must* or could satisfy the 'active state supervision' test focussed upon in *Midcal*." *City of Boulder*, 455 U.S. at 51–52 n. 14, 102 S.Ct. at 840–841 n. 14 (emphasis added).

state supervision of authorized municipal action is not required. *Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 383–84 (7th Cir.1983) (sewage collection, transportation, and treatment), *appeal pending; Gold Cross Ambulance & Transfer v. City of Kansas City,* 705 F.2d 1005, 1014–15 (8th Cir.1983) (ambulance services), *appeal pending; Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419 (8th Cir.1983) (solid waste disposal services); *Hybud Equipment Corp. v. City of Akron,* 1983–1 Trade Cas. (CCH) ¶ 65,356 (N.D. Ohio April 6, 1983) (same); *cf. City of North Olmsted v. Greater Cleveland Regional Transit Authority,* 722 F.2d 1284 (6th Cir.1983) (finding immunity for municipal operation of regional public transportation without discussing active supervision requirement); *Pueblo Aircraft Service, Inc. v. City of Pueblo,* 679 F.2d 805 (10th Cir.1982) (finding immunity for municipal operation of airport and aircraft services without discussing active supervision requirement), *cert. denied,* —— U.S. ——, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983).

Both the Seventh Circuit (in *Town of Hallie*) and the Eighth Circuit (in *Gold Cross Ambulance*) felt that requiring active state supervision over (traditional) municipal functions was unwise because such supervision erodes local autonomy, unnecessarily duplicates municipal supervision, and puts the state in the rather odd position of enforcing municipal ordinances.[13] The *Gold Cross Ambulance* court also emphasized that "[b]ecause municipal officials generally are politically accountable to the citizens they represent for their decisions

regarding the challenged restraint, state supervision is not as necessary to prevent abuse as in the private context." 705 F.2d at 1014. This Court agrees that these factors cut strongly in favor of not requiring in this case the type of active state supervision required by the Court in *Midcal.*

The Seventh and Eighth Circuits also relied heavily on the argument that "requiring state authorization for local conduct is analogous to requiring active supervision of private conduct; it tests whether challenged local activity is truly state action and therefore entitled to immunity." *Town of Hallie,* 700 F.2d at 384 (quoting P. Areeda, *Antitrust Law* § 212.2a at 47 (Supp.1982)); *Gold Cross Ambulance,* 705 F.2d at 1014 (same). This argument is equivalent to stating that the state's ability to change its policy and the attendant municipal authorization constitutes sufficient state supervision.[14] This Court does not go so far as to say that the state's power to change municipal authorization will *always* obviate the need for more regularized supervision; however, in this case it would be clearly pointless to require regularized supervision by some agency, authority, or other arm of the state.

The legislative history of CTV regulation in California shows an active and interested legislature. In 1979, the legislature acted to increase competition in CTV rates by removing municipal authority to regulate rates under certain conditions. Cal.Gov't Code § 53066.1. This deregulation program was fine-tuned by two amendments in 1982. Act of Aug. 30, 1982, ch. 679, 1982 Cal.Stats. 572; Act of Sept. 21, 1982, ch. 1256, 1982 Cal.Stats. 380. Moreover, in

---

**13.** *See also City of Boulder,* 455 U.S. at 71 n. 6, 102 S.Ct. at 851 n. 6 (dissenting opinion of Rehnquist, J.).

**14.** State supervision via authorization clearly does not satisfy the active state supervision requirement where private defendants are concerned; otherwise, the second prong of the *Midcal* test would never have any meaning because the state can always change its policy and its authorization. The Court also notes that a non-trivial state supervision requirement may apply to action by non-municipal governmental bodies. After all, the "active state supervision" requirement owes its origin to *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), in which the Court immunized the Arizona State Bar's ban on lawyer advertising partly because the State Bar rule was "subject to pointed re-examination by the policymaker—the Arizona Supreme Court—in enforcement proceedings." *Id.* at 362, 97 S.Ct. at 2698. *See also Ronwin v. State Bar of Arizona,* 686 F.2d 692, 697 (9th Cir.1981) (dictum), *cert. granted sub nom. Hoover v. Ronwin,* —— U.S. ——, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983).

section 53066.1(p), the legislature explicitly held open the possibility that it will again act to curtail municipal authority to regulate CTV. It would be a gross distortion of reality to lump this case in with *Midcal* and find no antitrust immunity because the state failed to supervise the implementation of its policies. Thus, the Court finds that the active state supervision test applied in *Midcal* does not apply to this case.[15] To put it another way, the Court finds that the legislative supervision via authorization that is present in this case satisfies the state supervision requirement applicable to municipalities.

Accordingly, the Court finds that the defendants are immune from antitrust liability for the challenged conduct. The plaintiff's antitrust claims are therefore dismissed.

## III. THE FIRST AMENDMENT CLAIMS

The plaintiff's First Amendment argument, like its antitrust argument, essentially states that the business of CTV operating must be thrown open to virtually everyone with the inclination to enter the industry. Plaintiff thus challenges the very institution of franchising CTV operators; it argues that CTV operating should be treated like newspaper publishing, which clearly could not be licensed or franchised as the Cities would franchise CTV operating. *Near v. Minnesota*, 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (holding that no access requirement or "right of reply" rule could be applied to newspapers). The Cities argue that there is no First Amendment right to be a CTV operator because CTV operating is characterized by physical and economic scarcity and because operating a CTV system involves disruptive use of public property. The Court finds that the motion to dismiss cannot be granted because there exist important factual issues that cannot be decided on the pleadings alone.[16]

### A. Standing and Ripeness

■ The Court finds that the plaintiff has standing to challenge the Cities' RFP process. Defendants argue that plaintiff lacks Article III standing under *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), in which the Supreme Court held that neither an organization dedicated to the separation of church and state nor the organization's (taxpaying) employees had standing to challenge a donation of surplus Government property to a church-related college. The Court stated the minimum requirements for Article III standing as follows:

> Art. III requires the party who invokes the court's authority to show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450] (1976).

454 U.S. at 472, 102 S.Ct. at 758 (footnote omitted).

---

**15.** This conclusion applies regardless of whether CTV regulation may be considered a traditional municipal function. On this point the Court notes a possible distinction between cable television and *community antenna* television. The latter entails the use of cable systems to improve reception of ordinary over-the-air television programming. The former entails the provision of programming created for the cable medium. Although community antenna television has been municipally regulated in California for over twenty years, it may be premature to determine whether CTV regulation is a traditional municipal function.

**16.** The Court cannot say, at this time, whether these issues are capable of resolution on a motion for summary judgment. If the defendants so move, the Court will consider a summary judgment motion accompanied by affidavits and other documents permitted by Rule 56 of the Federal Rules of Civil Procedure.

Since plaintiff objects to the requirement that it even *participate* in the RFP process, with its $5000 application fee and its minimum criteria for success, plaintiff clearly alleges real injury, fairly traceable to the challenged action, that plaintiff will personally suffer if it attempts to set up a CTV system in compliance with the Cities' requirements.[17] That injury would be redressed by a favorable decision of this Court. The *Valley Forge* Court also set forth several "prudential" standing principles. *Id.* 454 U.S. at 474–75, 102 S.Ct. at 759–60. None of these principles apply to deprive plaintiff of standing. Finally, the injury alleged in this case bears absolutely no resemblance to the abstract and speculative injuries alleged in *Valley Forge.*

■ The Court also finds that the case is ripe for adjudication.[18] Even though no final action has yet been taken and the negotiable conditions of phase 2 of the franchising process are not yet known, the Court does have before it the RFP's minimum requirements and the fact that plaintiff must participate in the RFP process in order to have any hope of securing a franchise or license. In this connection, the Court notes that plaintiff alleges it sought a business license from each of the cities; plaintiff was told that it had to participate in the RFP process. Plaintiff also alleges that it sought pole attachment services from the defendant City of Palo Alto Utilities and from Pacific Telephone and Pacific Gas and Electric, but each utility responded that no pole attachment services would be provided until plaintiff obtained a CTV franchise from the Cities.

### B. The Right to an Operating License

We accept, as the starting point for this discussion, the proposition that CTV opera-

tors are entitled to *some* First Amendment protection. *Community Communications Corp. v. City of Boulder,* 660 F.2d 1370, 1376 (10th Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 43–51 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Midwest Video Corp. v. FCC,* 571 F.2d 1025, 1052–57 (8th Cir.1978) (dictum), *aff'd on other grounds,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). The problem lies in determining just what government regulations are permissible.

> The Supreme Court has repeatedly emphasized that "[e]ach medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it," *Southeastern Promotions, Ltd. v. Conrad,* [420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975)], for "differences in the characteristics of news media justify differences in the First Amendment standards applied to them." [*Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969).]

*Community Communications,* 660 F.2d at 1377 (additional citations omitted). Moreover, in determining the degree of constitutionally permissible regulation, we must keep in mind that CTV technology may change over time; such developments may change the degree of permissible regulation. *Community Communications,* 660 F.2d at 1379 n. 11; *Midwest Video,* 571 F.2d at 1052.

The defendants argue that cable television can be regulated like the broadcast (*i.e.,* over-the-air) media, while the plaintiff argues that all the freedoms applicable to newspapers apply to cable television.

---

**17.** It is of no consequence that plaintiff brought this lawsuit rather than participate at all in the RFP process. This is so for two reasons: first, plaintiff objects to the very act of participating in the process rather-than to the prospective denial to plaintiff of a CTV franchise; second, plaintiff's First Amendment arguments challenge the RFP process as facially void. *See Lovell v. City of Griffin,* 303 U.S. 444, 452–53, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("As the ordinance is void on its face, it was not neces-

sary for appellant to seek a permit under it."). On plaintiff's readiness to enter the CTV operating industry, see note 4, *supra.*

**18.** Defendants' assertion of *Community Communications Co., Inc. v. City of Boulder,* 660 F.2d 1370 (10th Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982) is unavailing as that case concerned only appellate ripeness. *Id.* at 1377 n. 6.

Cases such as *Community Communications* and *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp. 976 (D.R.I. 1983) have held generally that CTV should not be afforded all the protections applicable to newspapers. Two other cases, both of which concerned challenges to specific FCC regulations of CTV, found no constitutional distinction between newspapers and CTV, and they assumed that no distinction existed. *Home Box Office,* 567 F.2d at 44–46; *Midwest Video,* 571 F.2d at 1055–56 (dictum). Three major arguments are advanced to justify treating cable television more like the broadcast media and less like newspapers; they are: physical scarcity, economic scarcity (or natural monopoly), and the disruptive use of public property.

### 1. Physical Scarcity

In *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), the Supreme Court held that "[t]he right of free speech does not include ... the right to use the facilities of radio without a license." *Id.* at 227, 63 S.Ct. at 1014. The Court reasoned that government licensing is necessary because the electromagnetic spectrum is simply not physically capable of carrying the messages of all who desire to speak over it. This principle has been reaffirmed many times. *E.g., Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 389, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).

Physical scarcity in the broadcast media exists because each speaker's message interferes with the messages of those close to him on the electromagnetic spectrum; this is not the case with CTV. Nevertheless, there may be some practical limit to the number of coaxial cables that may be hung from utility poles or buried underground. The Court is aware of no case upholding the right of a municipality to deny a CTV franchise or license on the basis of *physical* scarcity.[19] The Cities urge the Court to apply *NBC* to this case; this the Court refuses to do because there is a material issue of fact as to whether physical scarcity exists.[20] Plaintiff offers to prove that it does not, and the Court cannot simply assume the contrary.

### 2. Economic Scarcity

A far more controversial argument states that a municipality may deny a CTV license because CTV operating is a natural monopoly. There is thus a type of "economic scarcity" that justifies licensing just as physical scarcity justified licensing in *NBC.*

It seems clear that the economic scarcity argument cannot constitutionally be applied to newspapers. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 247–56, 94 S.Ct. 2831, 2834–39, 41 L.Ed.2d 730 (1974). *Home Box Office* and *Midwest Video* have suggested that, at least on the records before those courts, the rule of *Miami Herald* applies equally to CTV. *Home Box Office,* 567 F.2d at 46; *Midwest Video,* 571 F.2d at 1055 (dictum). Several other cases, however, have held that economic scarcity is a constitutionally permissible justification for municipal CTV licensing. *Community Communications Corp.*

---

**19.** In *Black Hills Video Corp. v. FCC,* 399 F.2d 65 (8th Cir.1968), the Eighth Circuit applied *NBC* to uphold certain FCC regulations of community antenna television. 399 F.2d at 69. The Court does not consider *Black Hills Video* to be compelling authority. First, CTV technology may have changed greatly since 1968. Second, the language employed by the Eighth Circuit in *Midwest Video,* 571 F.2d at 1052–57 casts considerable doubt on the continuing vitality of the constitutional holding of *Black Hills Video. See also Home Box Office,* 567 F.2d at 45 n. 80 (disapproving *Black Hills Video* and questioning other cases applying the physical scarcity rationale).

**20.** The Court cannot accept the defendants' argument that the application of *NBC* involves no issues of fact. The Cities argue that since the constitutionality of the (permissive) franchising statute, California Government Code section 53066, is not challenged, the Court should just assume its constitutionality and then apply only that part of *NBC* which holds that there is no right to a license. The existence of physical scarcity is central to the *NBC* case, and the Cities cannot avoid that factual issue.

*v. City of Boulder*, 660 F.2d 1370, 1378–79 (10th Cir.1981) (distinguishing *Miami Herald* and finding that natural monopoly is a constitutionally permissible justification for "some degree" of CTV regulation), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Berkshire Cablevision of Rhode Island, Inc. v. Burke*, 571 F.Supp. 976, 985 (D.R.I.1983) (following *Community Communications*); *Hopkinsville Cable TV v. Pennyroyal Cablevision, Inc.*, 562 F.Supp. 543, 547 (W.D.Ky. 1982); *cf. Omega Satellite Products v. City of Indianapolis*, 694 F.2d 119, 127–28 (7th Cir.1982) ("the apparent natural monopoly characteristics of cable television provide ... an argument for regulation of entry").

The Court need not, at this point, decide this important constitutional question. Plaintiff offers to prove that there is, in fact, no economic scarcity. The Court now has before it absolutely no facts or expert opinion upon which to make such a determination.

Moreover, this factual issue has not recently been explored by other courts. For example, the court in *Community Communications* found that natural monopoly was a constitutionally permissible justification for CTV regulation, but then remanded the case for factual findings on, among other things, "the degree of natural monopoly or 'scarcity' characterizing the medium." 660 F.2d at 1379. In *Omega Satellite Products*, the court affirmed the denial of a preliminary injunction; given the posture of the case and the lack of

factual findings, the court described its conclusions on the First Amendment issues as only "tentative." 694 F.2d at 124, 127–29. The Court in *Hopkinsville Cable TV* based its finding that CTV was a natural monopoly on a 1972 case concerning community antenna television. 562 F.Supp. at 547. Finally, while it appears that the *Berkshire Cablevision* court took some testimony, it is not clear on what that court based its finding that CTV was a natural monopoly. We therefore find it unwise to reject out of hand the plaintiff's contention that, with current technology, CTV operating is not a natural monopoly.

3. Disruptive Use of Public Property

CTV operating differs significantly from newspaper publishing in that the former entails far more disruptive use of the public domain, *viz.*, attaching cables to utility poles or digging up streets to bury the cables. Several courts have recognized this factor as at least a partial justification for CTV regulation. *Community Communications*, 660 F.2d at 1377–79; *Omega Satellite Products*, 694 F.2d at 127; *Berkshire Cablevision*, 571 F.Supp. at 985; *Hopkinsville Cable TV*, 562 F.Supp. at 547. While this Court agrees with the position taken in the cited cases, the problem is more complex in California because of the existence of California Public Utilities Code section 767.5, which essentially dedicates surplus space and excess capacity on public utility poles, conduits, manholes, or other "support structures" for use by CTV corporations.[21] Although section 767.5 does not

**21.** California Public Utilities Code section 767.-5(b) reads as follows:

The Legislature finds and declares that public utilities have dedicated a portion of such support structures to cable television corporations for pole attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations.

The Legislature further finds and declares that it is in the interests of the people of

California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations.

Section 767.5(a) provides, in pertinent part, that

(2) "Support structure" includes, but is not limited to, a utility pole, anchor, duct, conduit, manhole, or handhole.

(3) "Pole attachment" means any attachment to surplus space, or use of excess capacity, by a cable television corporation for a wire communication system on or in any support structure located on or in any right-of-way or easement owned, controlled, or used by a public utility.

apply to publicly owned utilities, such as defendant City of Palo Alto Utilities, plaintiff asserts a common law dedication theory as to facilities owned by that defendant.

This raises the question of whether California has invited or consented to plaintiff's proposed use of the public domain and whether such permission bears constitutional significance. *See Community Communications*, 660 F.2d at 1377–78 ("Some form of permission from the government must, by necessity, precede such disruptive use of the public domain."). The Court finds that the significance of section 767.5 can best be assessed in light of the facts about current CTV technology. There may be a disparity between the degree of disruption contemplated by the California legislature and the degree of disruption comprehended by plaintiff's position. The Court therefore defers a decision on the constitutional significance of section 767.5.

### CONCLUSION

The motion to dismiss is granted as to plaintiff's antitrust claims because the Cities' conduct is protected state action. The motion to dismiss is denied as to plaintiff's First Amendment claims because there exist significant factual questions that cannot be resolved on the pleadings alone.[22]

IT IS SO ORDERED.

---

22. In addition to challenging the franchising process in general, plaintiff challenges specific parts of the Cities' RFP, such as its financial requirements and its program and channel requirements, including the local access rules. To a great extent, the propriety of these requirements depends on the degree of First Amendment protection that the Court ultimately finds appropriate. While the program and channel requirements *might be* invalid as content restrictions even if the Court finds that there is no general First Amendment right to a CTV license, the Court declines, at this time, to decide this issue, which is best considered as part of a plenary examination of the First Amendment implications of CTV franchising.