**CENTRAL AMBULANCE SERVICE, INC. and American Ambulance Service**

v.

**CITY OF DALLAS and County of Dallas, Texas.**

No. CA3–84–1819–F.

United States District Court, N.D. Texas, Dallas Division.

March 26, 1986.

Roderick G. Dorman, Richard A. Jones, Los Angeles, Cal., John A. Price, Nancy A. Thomas, Dallas, Tex., for plaintiffs.

Analeslie Muncy, City Atty., Kent S. Hofmeister, Terrence S. Welch, Asst. City Attys., Dallas, Tex., for defendants.

## MEMORANDUM ORDER AND OPINION

ROBERT W. PORTER, District Judge.

This case is before the Court on plaintiffs' motion pursuant to Federal Rules of Civil Procedure 56(d) and 16(c)(1) that the following issue be determined prior to trial: Does the state action immunity doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and its progeny bar plaintiffs' claims for relief against the City of Dallas in this action? Having considered the applicable law and the arguments of counsel, the Court has determined that the City of Dallas is entitled to assert immunity under the rule of *Parker v. Brown*.

*Facts*

In this case, plaintiffs assert that the City of Dallas and Dallas County have committed violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. Specifically, Central and American challenge the operation of a municipal ambulance and emergency rescue service by the City and County.

For purposes of this motion, the focus is primarily on the City's conduct.

The City of Dallas is a home rule city, situated in Dallas County, empowered with full authority of self-government. *See* Art. 11, § 5 Texas Constitution. The challenged ambulance service is operated pursuant to municipal ordinance. *See* Dallas, Texas Ordinances Ch. 15D, Art. I, para. 15D–1—15D–9. Under this ordinance, all emergency ambulance service within the City of Dallas is provided by the city fire department. Private ambulance service is provided within the City in non-emergency and other limited circumstances as set out in § 15D–3(a) and (b). Also, the ordinance details requirements regarding qualifications of ambulance drivers and equipment.

Plaintiffs also challenge the City's implementation of a single emergency number (744–4444) for fire, police and ambulance service. It is argued that use of this single number has the effect of foreclosing Central and American from access to emergency calls within the City except when the fire department is unable or unwilling to respond to an emergency call. Plaintiffs contend this constitutes development by the City of "a public dispatch system for receiving substantially all requests for emergency ambulance services." Ultimately, plaintiffs contend that as private providers of both emergency and non-emergency care outside the city limits, they stand willing and able to engage in similar activities within the City. But for the alleged illegal conduct of the City, Central and American represent that they would be able to compete freely against the city's fire department for emergency ambulance calls.

### The Parker Doctrine

This factual scenerio triggers the conflict between antitrust and federalism concerns which is addressed by the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker*, a producer and packer of California raisins challenged under the Sherman Act a state statutory program which permitted a state agency to control the shipping and pricing of the state's entire raisin crop. *See Parker*, 317 U.S. at 344–45, 63 S.Ct. at 310–11. Chief Justice Stone identified the purpose of the Sherman Act: "to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations." *Parker*, 317 U.S. at 351, 63 S.Ct. at 313. In recognizing this purpose, the Court also acknowledged that activity prohibited by the Sherman Act does not encompass the legitimate exercise of police power by the several states. *See Parker*, 317 U.S. at 352, 63 S.Ct. at 314. The exemption created by the *Parker* Court "is a doctrine of federalism; it is premised on the proposition that the State should be free to replace competition with regulation or public ownership without incurring antitrust liability." *Century Federal v. City of Palo Alto, Cal.*, 579 F.Supp. 1553, 1555 (N.D.Cal.1984); *see also Woolen v. Surtran Taxicabs, Inc.*, 615 F.Supp. 344, 346 (N.D.Tex.1985) (*Parker* Court relied on principles of federalism and state sovereignty in holding the Sherman Act inapplicable to anticompetitive conduct of a state acting through its legislature). State antitrust immunity under the *Parker* doctrine "springs from an essential principle of federalism, the necessity to respect a sovereign capacity in the several states." *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir.1985). As a practical matter, the so-called *Parker* "exemption" is not truly an exemption or immunity, but is, strictly speaking, a doctrine which recognizes that the Sherman Act does not reach certain activities of states acting in their sovereign capacities. *Century Federal*, 579 F.Supp. at 1555, n. 5. *See* also *Town of Hallie v. City of Eau Claire*, 471 U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) (Parker Court construed Sherman Act as not applicable to "anti-competitive conduct of state acting through its legislature").

The *Parker* doctrine thus recognizes certain state actions as beyond the reach of the antitrust laws. A municipality, however, does not enjoy the sovereign status of a state and its actions are not automatically exempt from Sherman Act liability. In *Lafayette v. Louisiana Power*

& *Light Co.,* the Supreme Court reviewed a case in which the challenged anticompetitive conduct was that of a city organized under state law. 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). Justice Brennan, writing for a plurality of the Court, stated that "the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State, *or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1137 (emphasis added). "Because it is not itself sovereign, a municipality falls within the Sherman Act's prohibition of private anticompetitive conduct unless the municipality can show that its activities were authorized by the State 'pursuant to a state policy to displace competition with regulation or monopoly public service.' " *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.,* 760 F.2d 607, 609 (5th Cir.1985) (citing *Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1137). The *Lafayette* Court emphasized that its decision meant "only that when the state itself has not ordered or authorized an anticompetitive practice, the state's subdivisions in exercising their delegated power must obey the antitrust laws." 435 U.S. at 416, 98 S.Ct. at 1138. The question whether municipalities, like private parties, *see California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105–06, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980), must also show that the state exercised active supervision over the challenged conduct was expressly left open. In a subsequent decision, the Supreme Court summarized the *Parker* doctrine as it applies to municipalities: A municipal act "cannot be exempt from antitrust scrutiny unless it constitutes the action of the state ... itself in its sovereign capacity ..., or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Community Communications Co. v. Boulder,* 455 U.S. 40, 52, 102 S.Ct. 835, 841, 70 L.Ed.2d 810 (1982) (citations omitted).

After these decisions, the most substantial area of controversy in application of the *Parker* doctrine centered on the degree of clarity with which a state legislative policy must be articulated for a municipality's actions to qualify for the protection of the *Parker* doctrine. This question was addressed by the Court in *Town of Hallie v. City of Eau Claire,* 471 U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1925). After discussing the particular conduct challenged and the applicable statutes, the Court concluded that the statutes sufficiently articulated and affirmatively expressed the state policy to displace competition. *See Town of Hallie,* 471 U.S. at ——, 105 S.Ct. at 1718–20, 85 L.Ed.2d at 32–33. Under *Town of Hallie,* it is *not* necessary to invoke the *Parker* doctrine that a state statute *compel* the challenged practice:

> [W]here the actor is a municipality, acting pursuant to a clearly articulated state policy, compulsion is simply unnecessary as an evidentiary matter to prove that the challenged practice constitutes state action. In short, although compulsion affirmatively expressed may be the best evidence of state policy, it is by no means a prerequisite to a finding that a municipality acted pursuant to a clearly articulated state policy.

*Town of Hallie,* 471 U.S. at ——, 105 S.Ct. at 1720–21, 85 L.Ed.2d at 33–34. Instead, *Town of Hallie* provides that "a sufficient state policy to displace competition exists if the challenged restraint is a necessary or reasonable consequence of engaging in the authorized activity." *Gold Cross Ambulance & Transfer v. City of Kansas City,* 705 F.2d 1005, 1013 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). *See e.g., Fisher v. Berkeley,* —— U.S. ——, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986.) ("general grant of authority to regulate rents" would have been sufficient, under *Town of Hallie,* to exempt Berkeley's rent control ordinance from antitrust scrutiny). In *Town of Hallie,* the Court found active state supervision of challenged municipal activity to be unnecessary where state authorization is found.

471 U.S. at ——, 105 S.Ct. at 1720–21, 85 L.Ed.2d at 34. To avoid scrutiny under the antitrust laws, the City of Dallas must therefore demonstrate that its ambulance and emergency rescue system was implemented pursuant to a statutory scheme which clearly articulates a state policy to displace competition and that the challenged practice was a logical result of the statutory scheme. *See Town of Hallie*, 471 U.S. at ——, 105 S.Ct. at 1717–18, 85 L.Ed.2d at 31.

■ That the City of Dallas is a home rule city under the Texas Constitution does not alone affect the availability of *Parker* immunity. In *Community Communications Company v. Boulder*, a city ordinance temporarily prohibiting expansion of cable television service was challenged under the Sherman Act. 455 U.S. 40, 44–46, 102 S.Ct. at 837–38 (1982). The City of Boulder defended, arguing that the *Parker* criteria were satisfied by the direct delegation of powers to municipalities pursuant to the Home Rule Amendment to the Colorado Constitution. *Boulder*, 455 U.S. at 52, 102 S.Ct. at 841. Specifically, Boulder argued that regulation of cable television is fundamentally a local concern causing local problems; it follows then that "the city's moratorium ordinance is an 'act of government' performed by the city *acting as the state* in local matters, which meets 'the state action' criteria of *Parker*." *Boulder*, 455 U.S. at 53, 102 S.Ct. at 842 (emphasis in the original). The Court rejected this argument, ruling that "the requirement of 'clear articulation and affirmative expression' is not satisfied when the state's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." 455 U.S. at 55, 102 S.Ct. at 843. A contrary ruling, the Court reasoned, would negate the requirements of 'clear articulation and affirmative expression' as developed in previous cases, and would require recognition of *Parker* immunity in situations where there had been no state action whatsoever. *See Boulder*, 455 U.S. at 56, 102 S.Ct. at 843. Thus, at least in situations where the state legislature has not in any way affirmatively addressed the subject of the challenged municipal activity, a municipality's status as a home rule city alone does not trigger the *Parker* doctrine's protection.

*The Texas Legislative Scheme*

The City of Dallas asserts it is entitled to protection under the *Parker* doctrine because "it has been vested by state statute with extensive regulatory discretion over the emergency medical services industry, and it is specifically authorized by state law to establish standards for the staffing and equipment of emergency medical services and vehicles and to grant contracts related thereto within the City of Dallas and in certain circumstances within Dallas County and cities located within 30 miles of the City of Dallas." This grant of authority, it is argued, derives from several statutory provisions.

■ The area of emergency health care and services is specifically addressed by both the Emergency Medical Services Act ("EMS Act"), Tex.Rev.Civ.Stat.Ann. arts. 4447*o*, 4447*o*–1, and the Emergency Communication District Act ("ECD Act"). Tex.Rev.Civ.Stat.Ann. art. 1432d. The EMS Act is intended "to provide for the prompt and efficient transportation of sick and injured patients, after necessary stabilization, and to encourage public access to such transportation in all areas of the state." Tex.Rev.Civ.Stat.Ann. art. 4447*o*, § 1.02. Toward that end, the statute creates an eighteen member advisory council of which at least six members are to be representatives of local government, *id.* § 3.01(a)(2), (3), (7), authorizes local government registration, inspection and collection of fees regarding emergency medical service vehicles, *id.* §§ 3.04(c) and (d), encourages municipalities to enforce the act and to utilize penalities recovered "to improve the delivery of emergency services in their jurisdiction," *id.* § 3.14(b), and allows a city to provide emergency medical services for the county wherein it is located or a city within thirty miles under certain limited circumstances. *Id.* at 4447*o*–1, § 2. Certain sections of the Act contemplate provision and

supervision of emergency medical services care by municipalities. For instance, of the eighteen appointed members of the Advisory Council, "one must be a local governmental provider of emergency medical services." *Id.*, § 3.01(7). Also, a municipality is free to adopt its own standards for staffing and equipment, provided they are more strict than those imposed under the Act and department rules adopted under the Act. *Id.*, § 3.10. The statute also provides that "[a]ny ... entity of state and local government that authorizes, sponsors, supports, finances, or supervises" emergency medical care providers is subject to the standard of ordinary care. *Id.*, § 3.18. Although the statute does not in so many words authorize municipalities to implement and provide emergency medical services, "the statute's broad phrasing is a strong indication of the state's desire to abdicate in favor of municipal prescience" with regard to provision of emergency medical services. *See Independent Taxicab,* 760 F.2d at 610.

This conclusion is buttressed by the equally broad grant of authority found in the statutorily enumerated powers of Texas home rule cities by which the City of Dallas is empowered:

> to license, operate and control the operation of all character of vehicles using the public streets, including motorcycles, automobiles or like vehicles, and to prescribe the speed of the same, the qualification of the operator of the same, and the lighting of the same by night and to provide for the giving bond or other security for the operation of same.

and

> to regulate, license, and fix the charges or fares made by any person owning, operating or controlling any vehicle of any character used for the carrying of passengers for hire for the transportation of passengers for hire or the transportation of freight for hire on the public streets or alleys of the city.

*Id.*, art. 1175(20), (21). These statutory provisions are typical of statutes governing municipalities, which are "often drafted in general terms and delegate broad discretion to cities." *See Seay Brothers, Inc. v. City of Albuquerque,* 601 F.Supp. 1518, 1521 (D.N.Mex.1985). To find the City of Dallas protected from antitrust scrutiny, this Court need only find the decision to provide medical care through the Dallas Fire Department to be a "logical or reasonable consequence of the state's broad allocation of authority." *See Independent Taxicab,* 760 F.2d at 611; *see also Town of Hallie,* 471 U.S. at ——, 105 S.Ct. at 1720–21, 85 L.Ed.2d at 34; *Grason Electric Co. v. Sacramento Municipal District,* 770 F.2d 833, 836 (9th Cir.1985). Against this statutory background, it is easy to see that the state legislature envisioned that municipalities might choose from a variety of options in providing emergency medical care, and that choosing from these options might have the anticompetitive effect complained of here. The statutes effectively authorize Dallas to maintain and operate its own emergency medical care service, and pragmatically it is simply unrealistic to expect the state legislature to dictate a particular course of conduct for the many municipalities within the state. "State and local authorities would be in a difficult bind were authorization to displace competition insufficient to invoke the state action exemption .... A state should not be *forced* to choose, on behalf of each municipality, between free competition, regulation, and municipal ownership." *Century Federal,* 579 F.Supp. at 1558 (emphasis in original). The challenged activity in this case is reasonably related to the city's express powers and is in furtherance of state goals relating to provisions of emergency medical services; this is sufficient to allow the City of Dallas the protection of the *Parker* doctrine. *See Hybud Equipment Corp. v. City of Akron, Ohio,* 742 F.2d 949, 1960–61 (6th Cir.1984) *cert. denied,* —— U.S. ——, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985) ("If the challenged restraints are reasonably related to an agency's express powers and reasonably designed to promote the state aims within a designated field of regulation, they can be found to result from a

'clearly and affirmatively expressed state policy' to displace competition.")

This conclusion is further supported by Texas law relating to municipal home rule powers, both generally and in the emergency medical services context. Discussing the inherent police power of a home rule city in Texas, the Texas Supreme Court has stated:

A city may enact reasonable regulations to promote the health, safety and general welfare of its people .... Thus, in order for ... [an] ordinance to be a valid exercise of the city's police power ... there are two related requirements. First, the regulation must be adopted to accomplish a legitimate goal; it must be 'substantially related' to the health, safety or general welfare of people. Second, the regulation must be reasonable; it cannot be arbitrary.

*City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex.1984) (drawing distinction between a taking and a valid exercise of police power). A non-home rule city may legitimately exercise only those powers which the law "expressly or impliedly" confers; Texas courts will imply only those powers which are reasonably related to those expressly granted or which are essential to the object and purposes of a municipality. *City of West Lake Hills v. Westwood Legal Defense Fund*, 598 S.W.2d 681 (Tex.Civ.App.—Waco 1980). A home rule city, however, has considerably more freedom to act, and "is not required to look to the legislature for a grant of power to act, but only to ascertain if the legislature has placed limitations on the city's constitutional power." *Burch v. City of San Antonio*, 518 S.W.2d 540, 543 (Tex.1975); *Lower Colorado River Authority v. City of San Marcos*, 523 S.W.2d 641 (Tex.1975). Within this statutory framework, the operation of emergency ambulance and medical service by the City of Dallas has been found to be a legitimate and justifiable governmental function. *See Brantley v. City of Dallas*, 545 S.W.2d 284, 286 (Tex.Civ.App.—Amarillo 1976) (provision of ambulance service is govern-

mental function for purposes of immunity under Texas Tort Claims Act).

■ As for plaintiff's challenge to the institution of a single emergency phone number, it is abundantly clear that this action on the part of the city is in response to a "clearly articulated and affirmatively expressed state policy." *See Boulder*, 455 U.S. at 52, 102 S.Ct. at 841. One component of the stated purpose of the ECD Act is "to encourage units of local government ... to develop and improve emergency communication procedures and facilities." Tex.Rev.Civ.Stat.Ann. art. 1432d, § 2. The legislature specifically found that "it is in the public interest to shorten the time required for a citizen to request and receive emergency aid," there are "thousands of different emergency telephone numbers throughout the state," and provision of a single statewide emergency number (9–1–1) would be "a significant contribution to law enforcement and other public safety efforts by making it less difficult to notify quickly public safety personnel." *Id.*, § 2(1)–(4). Implementation of a single emergency number within the City of Dallas furthers the purposes of the ECD Act and to the extent that plaintiffs contend this practice is violative of the Sherman Act, defendant City of Dallas is entitled to *Parker* immunity.

*Conclusion*

As noted by plaintiffs, it is true that not all statutes have a logical result of displacing competition, and the state statutes which give rise to *Parker* immunity here do serve to regulate both private and public providers of emergency medical care and services. The inevitable conclusion, however, is that the City of Dallas' choice to provide emergency medical services through its fire department was one which logically and foreseeably arose from the statutory framework enacted by the Texas legislature. This case does not deal with waste removal or taxicab service, where the end result of competition between various providers is the survival of the most competent and the weeding out of those

less able to satisfy the needs of the public. "Emergency service is provided for patients in circumstances which call for immediate action and in which the element of time in transporting the sick, wounded or injured for medical treatment is essential to the health or life of the person." *Brantley*, 545 S.W.2d at 285. This case deals with provision of emergency services which are, in this context, roughly equivalent to police and fire service. *See Ayala v. City of Corpus Christi*, 507 S.W.2d 324, 328 (Tex.Civ.App.—Corpus Christi 1974). The foreseeable consequence of injecting the element of competition into the city's ambulance service is that the public suffers immediate effects of the weeding out process. The failings and inefficiencies of competitors are visited on the individuals whose lives and health depend upon the quality of the service provided. It is difficult to imagine a state legislature which actually envisioned a competitive marketplace for providers of emergency medical services. It has been noted that in the antitrust context, as between "a competitive market structure and efficiency," the majority of courts choose efficiency. Philip Areeda and Donald Turner, *Antitrust Law*, ¶ 104, at 9. (1978). A ruling that the City of Dallas is entitled to the protections of the *Parker* doctrine in this case furthers not only the goal of efficiency, but recognizes the legislative and municipal duties to protect and serve the people.

Accordingly, in response to plaintiff's motion for summary adjudication, it is hereby determined that the City of Dallas' provision for emergency medical services and implementation of a single emergency phone number is protected from federal antitrust scrutiny under the *Parker* doctrine.