INDEPENDENT TAXICAB DRIVERS'
EMPLOYEES, et al.,
Plaintiff-Appellants,

v.

GREATER HOUSTON TRANSPORTA-
TION COMPANY, etc., et al.,
Defendants-Appellees.

ARROW NORTHWEST, INC., et al.,
Plaintiffs-Appellants,

v.

GREATER HOUSTON TRANSPORTA-
TION COMPANY, etc., et al.,
Defendants-Appellees.

No. 83–2705.

United States Court of Appeals,
Fifth Circuit.

May 17, 1985.

---

Able & Coleman, P.C., Tom F. Coleman, Jr., Thomas Lee Bartlett, Dabney & Garwood, Joseph H. Sperry, St. John Garwood, Jr., Houston, Tex., for Arrow Northwest, Inc., et al.

Robert A. Jones, Houston, Tex., for Independent Taxicab.

Andrew & Kurth, Paul E. Harris, Bradley Westmoreland, Hirsch & Westheimer, Michael S. Wilk, Sears & Burns, Will Sears, Houston, Tex., for Greater Houston Transp.

Laura S. Portwood, City of Houston Legal Dept., Vinson & Elkins, John L. Murchison, Jr., Ann Lents, Houston, Tex., for City of Houston.

Before GOLDBERG, JOHNSON, and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

Plaintiffs-appellants Independent Taxicab Drivers' Employees ("Independents") and Arrow Northwest, Inc. ("Arrow") are two groups of taxicab operators and owners in the City of Houston, a Texas municipality which owns and operates the Houston Intercontinental Airport. On January 1, 1969, the City entered into a contract with the Greater Houston Transportation Corporation, d/b/a Yellow Cab Company, by which the City granted to Yellow Cab an exclusive concession [1] over passenger service at the airport. According to appel-

---

1. Although the contract did not on its face provide for exclusivity, we will assume for purposes of this appeal, as did the district court below, that the contract afforded Yellow Cab exclusive dominion over the airport's taxicab transportation. Similarly, we view all relevant facts in the light most favorable to appellants on this appeal from summary judgment for the defendants. *John v. Louisiana,* 757 F.2d 698, 708, 710–11 (5th Cir.1985).

lants, the arrangement has restrained taxicab competition at the Airport because anyone seeking to operate a cab out of the facility must subcontract through Yellow for the privilege, and Yellow has proved itself loathe to loosen its grip on the Airport market. Non-Yellow taxis must first remove their secondary radios before being allowed to participate in the Yellow pool of taxis for passenger pick-up at the airport, a requirement which impedes these outsider cabs from competing on a par with other companies for passengers who have radioed ahead for service. Moreover, once admitted to the pool, the subcontracting companies are summoned for business by the dispatcher at the rate of one outsider for every fourteen Yellow cabs. If appellants' version of the story approaches the truth, the taxicab market is far from free at Houston Intercontinental. Indeed, one could hardly call it checkered.

The Independents and Arrow filed suit[2] in federal district court under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), and sections 4 and 16 of the Clayton Act, *id.* §§ 15, 26, seeking damages from and injunctive relief against the City and Yellow.[3] The district court dismissed the complaint on defendants' motion for summary judgment, holding that the City is immune from antitrust scrutiny under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and that Yellow is immune under the *Noerr-Pennington* doctrine, *see United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). We affirm.

**2.** Although appellants filed their suits separately as class actions, the district court certified neither the Independents nor Arrow as a class representative.

**3.** The complaints also alleged claims under the commerce clause, the equal protection clause, and 42 U.S.C. § 1983, as well as under various state law theories. The district court granted summary judgment for the defendants on each

## I.

■ Relying on principles of state sovereignty and federalism, the Supreme Court held in *Parker* that the Sherman Act does not reach the anticompetitive conduct of a state speaking through its legislature. 317 U.S. at 350–51, 63 S.Ct. at 313. More recently, the Court has considered the extent to which a municipality may be similarly exempt from federal antitrust scrutiny. Because it is not itself sovereign, a municipality falls within the Sherman Act's prohibition of private anticompetitive conduct unless the municipality can show that its activities were authorized by the state "pursuant to state policy to displace competition with regulation or monopoly public service." *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978) (plurality opinion). Until very recently, the specificity with which a state had to declare its sanctioning of anticompetitive municipal conduct was a subject of some debate. Not only did courts struggle with the perplexities of how explicit a state's legislative authorization had to be, but they also agonized over the sufficiency of mere authorization versus compulsion: Did the state have to require anticompetitive conduct of a municipality before the municipality could claim exemption from federal antitrust scrutiny, or would the state's *permission* suffice? If the latter, could a municipality stretch the limits of its empowerment, or did the challenged activity have to be a "reasonable consequence" of municipal regulation in the given area? And finally, could a municipality avail itself of *Parker* immunity absent active state supervision, or did the state have to retain a more active role in order to immunize the non-sovereign entity?

of the federal claims and dismissed the pendent state claims as a matter of trial court discretion under *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *See also Tinker v. DeMaria Porsche-Audi, Inc.,* 632 F.2d 520, 523 (5th Cir.1980). Appellants contest only the dismissal of their antitrust claims.

The Supreme Court put to rest much of this ambiguity in *Town of Hallie v. City of Eau Claire,* —— U.S. ——, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). In *City of Eau Claire,* a unanimous Court reiterated that *Parker* exemption applies whenever the state legislature has "clearly articulated and affirmatively expressed" a state policy to displace competition in the regulated area—that is, whenever " ' "the legislature contemplated the kind of action complained of." ' " *Id.,* 105 S.Ct. at 1719 (quoting *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138 (citation omitted)). Moreover, the Court held that "although compulsion affirmatively expressed may be the best evidence of state policy, it is by no means a prerequisite to a finding that a municipality acted pursuant to a clearly articulated state policy." *Id.*[4] After *City of Eau Claire,* clear articulation can comprise authorization short of compulsion. Finally, the Court concluded that the "active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Id.*[5] A clear articulation of state policy sets both the floor and the ceiling for municipal invocation of *Parker* immunity.

■ Applied in the present context, these principles make clear that the City of Houston is immune from federal antitrust liability for its treatment of taxicabs at Intercontinental Airport. Two statutes are relevant. First, Texas empowers its municipalities

'[t]o regulate, license and fix the charges and fares made by any person owning, operating or controlling any vehicle of any character used for the carrying of passengers for hire or the transportation of freight for hire on the public streets and alleys of the city.

Tex.Rev.Civ.Stat.Ann. art. 1175(21) (Vernon 1963); *see also id.* art. 1175(20). Thus, in at least a general sense, the state legislature has vested extensive regulatory discretion in its cities over the taxicab industry.[6] *See Bellew v. City of Houston,* 456 S.W.2d 185, 187 (Tex.Civ.App.1970). More particularly, though, the state has specifically authorized its municipalities to grant contracts for the provision of goods and services at their airports:

(a) ... In operating an airport ... such municipality may ... enter into contracts, leases and other arrangements for a term not exceeding forty (40) years with any persons:

. . . .

(2) conferring the privilege of supplying goods, commodities, things, services or facilities at such airport....

. . . .

In each case the municipality may establish the terms and conditions and fix the charges, rentals or fees for the privileges or services....

*Id.* art. 46d–4 (Vernon 1969). While the latter provision falls short of expressly mentioning the establishment of ground transportation services, the statute's broad phrasing is a strong indication of the state's desire to abdicate in favor of municipal prescience with regard to airport management.

---

**4.** *See City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138 ("a specific, detailed legislative authorization" of monopoly service need not exist to infer the necessary state intent"); *see also Hoover v. Ronwin,* —— U.S. ——, 104 S.Ct. 1989, 1995, 2001 & n. 33, 80 L.Ed.2d 590 (1984).

**5.** In this respect, deciding whether *Parker* immunity applies to anticompetitive municipal conduct differs from deciding whether *Parker* applies to the anticompetitive conduct of private parties. *Compare City of Eau Claire,* 105 S.Ct. at 1719–21 *with Southern Motor Carriers Rate Conference, Inc. v. United States,* —— U.S. ——, 105 S.Ct. 1721, 1717, 85 L.Ed.2d 36 (1985) (private parties, and state agencies or officials regulating the conduct of private parties, fall within *Parker* only upon the satisfaction of two criteria: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.' Second, the State must supervise actively any private anticompetitive conduct." (citations omitted)); *see California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).

**6.** The City has for years seen fit to exercise this discretion. *See* Houston, Tex., Code of Ordinances §§ 45–1 to –91 (1968).

This indication is all we require. In *City of Eau Claire,* the Supreme Court considered a Wisconsin statute that did not explicitly reflect a legislative expectation of municipal anticompetitive conduct in the provision of sewage services. Dispensing with the argument that the statute failed to articulate state policy specifically enough to implicate the city's *Parker* immunity, the Court observed:

> [I]t is sufficient that the statutes authorized the City to provide sewage services and also to determine the areas to be served. We think it clear that anticompetitive effects logically would result from this broad authority to regulate.
>
> . . . .
>
> The [plaintiffs'] argument [for greater specificity] amounts to a contention that to pass the "clear articulation" test, a legislature must expressly state in a statute or its legislative history that it intends for the delegated action to have anticompetitive effects. This contention embodies an unrealistic view of how legislatures work and of how statutes are written. No legislature can be expected to catalog all of the anticipated effects of a statute of this kind.

105 S.Ct. at 1718, 1719. We think it equally clear that the City of Houston might deem it most efficient to confer the privilege of airport taxicab operation on a single company,[7] and that such a decision is a logical or reasonable consequence of the state's broad allocation of authority to the City to run its own airport.

■ As did the Court in *City of Eau Claire,* we find the decision in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), to be of limited applicability. In *City of Boulder,* the Court held that the Home Rule Amendment to Colorado's constitution "was neutral and did not satisfy the 'clear articulation' component of the state action test." *City of Eau Claire,* 105 S.Ct. at 1719; *City of Boulder,* 455 U.S. at 55–56, 102 S.Ct. at 843. The Home Rule Amendment spoke in only the most general terms, enabling Colorado municipalities to regulate not merely the industry at issue in that case—cable television—but also virtually any area of local concern. The Amendment did not even address the regulation of cable television. In contrast, Texas has delegated the management of both private paid carriers and airports to the state's municipalities through statutes expressly directed toward these ends. We know that the Supreme Court has not granted full license to the states to confer monopoly status with a magical pass of the legislative wand. *See Southern Motor Carriers Rate Conference, Inc. v. United States,* — U.S. —, 105 S.Ct. 1721, 1729 n. 23, 85 L.Ed.2d 36 (1985). But where a state has to this extent articulated a policy of regulatory deference to its municipalities, and where a city has not unreasonably exercised its authority, the city's actions are not subject to the constraints of federal antitrust law.

■ Appellants object that state policy could not allow for the creation of monopoly power by municipalities because the Texas Constitution expresses in no uncertain terms a distaste for anticompetitive conduct. Tex. Const. art. I, § 26 ("[M]onopolies are contrary to the genius of free government, and shall never be allowed . . . ."). We are unpersuaded. The Texas courts have construed this constitutional provision as not extending to "[c]ases in which an exclusive right or privilege is granted upon the property or premises of the grantor." *State v. Gulf Refining Co.,* 279 S.W. 526, 530 (Tex.Civ.App.1925); *see Schnitzer v. Southwest Shoe Corp.,* 364 S.W.2d 373, 374–75 (Tex.1963); *Karam v. H.E. Butt Grocery Co.,* 527 S.W.2d 481, 484–85 (Tex.Civ.App.1975); *Neiman-Marcus Co. v. Hexter,* 412 S.W.2d 915, 917 (Tex.Civ.App.1967); *see also City of Brenham v. Brenham Water Co.,* 67 Tex. 542, 4 S.W. 143, 153 (1887) (noting that there are

---

**7.** The district court noted that the City's initial embrace of exclusivity was motivated by the dearth of adequate ground transportation facilities that accompanied the opening of Intercontinental in 1969.

"certain classes of exclusive privileges which do not amount to monopolies"). Houston's ownership of Intercontinental would seem to bring its exclusive concession directly within this exception. More pointedly, though, the Texas caselaw holds that a municipality may confer an exclusive contract for ground transportation service to and from airports owned by the municipality, and that such conferral does not violate the anti-monopoly clause of the Texas Constitution. *Airport Coach Service, Inc. v. City of Fort Worth,* 518 S.W.2d 566, 572 (Tex.Civ.App.1974); *accord Continental Bus System, Inc. v. City of Dallas,* 386 F.Supp. 359, 364–66 (N.D.Tex.1974). The Texas Constitution is not inconsistent with the potentially anticompetitive state policy that can reasonably be inferred from the state's broad grant of authority over airport management to municipalities.[8]

## II.

■ We need not pause long over appellants' contention that, even if the City is immune from federal antitrust scrutiny un-der *Parker,* Yellow can be held liable under the Sherman and Clayton Acts for its efforts in securing the exclusive airport taxicab concession from Houston. On appellants' view, the *Noerr-Pennington* doctrine cannot shield Yellow because (1) the doctrine applies only to "specific attempts to influence public officials, legislation or executive action" rather than to "arm's length contractual negotiations," and (2) even if a private party's arm's length contractual activity does implicate the doctrine, Yellow's relationship with the City falls within a "commercial exception" to *Noerr-Pennington* immunity.[9]

■ "The *Noerr-Pennington* doctrine provides an exception to antitrust liability enabling citizens or business entities to influence or to petition public officials to take official action that will harm or eliminate competition." *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566 (5th Cir.1984) (en banc), *petition for cert. filed sub nom. Gulf Coast Cable Television Co. v. Affiliated Capital Corp.,* — U.S. —, 105 S.Ct. 1164, 84 L.Ed.2d 316 (1984). In

---

**8.** Similarly, it is of limited significance that the statute authorizing municipal airport management states that the municipality's actions shall not be "inconsistent with, or contrary to, any Act of the Congress of the United States ...." Tex.Rev.Civ.Stat.Ann. Art. 46d–7(c) (West.Supp. 1985). The relevant question is not whether the City has transgressed federal law, but whether the Sherman & Clayton Acts apply to the City at all.

**9.** Appellants also argue that Yellow's conduct falls within either the sham or co-conspirator exception to *Noerr-Pennington. See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511–15, 92 S.Ct. 609, 612–14, 30 L.Ed.2d 642 (1972); *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1567 (5th Cir. 1984) (en banc), *petition for cert. filed sub nom. Gulf Coast Cable Television Co. v. Affiliated Capital Corp.,* — U.S. —, 105 S.Ct. 1164, 84 L.Ed.2d 316 (1984); *Coastal States Mktg., Inc. v. Hunt,* 694 F.2d 1358, 1368–73 (5th Cir.1983); *Woods Exploration & Producing Co. v. Aluminum Co. of Am.,* 438 F.2d 1286, 1296–98 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). *See generally* 1 P. Areeda & D. Turner, *Antitrust Law* ¶¶ 203–04 (1978 & Supp.1982). We find little support for the point, regardless of which branch of "sham" is asserted. *See generally Coastal States,* 694

F.2d at 1371 n. 42. Appellants have cited nothing in the record other than an allegation in their initial complaint that the defendants conspired to monopolize. *See* Record vol. 4, at 832–34. To the contrary, appellants conceded in their main brief that "[Yellow's] negotiations with respect to the subject exclusive concession agreement was [sic] undertaken at arm's length...." *Brief for Appellant Arrow* at 46; *Brief for Appellant Independents* at 45–46. Thus, while the existence or nonexistence of sham-ful conduct is generally a question of fact for the jury, *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530, 543 (5th Cir.1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979), appellants have nonetheless failed to present enough evidence to survive Yellow's motion for summary judgment. *Cf. Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228–32 (7th Cir.1975) (holding that agreement of government official to petitioning entity's anticompetitive plan was insufficient to render the official a "co-conspirator" for purposes of undermining *Noerr-Pennington* immunity). *But cf. Duke & Co., Inc. v. Foerster,* 521 F.2d 1277, 1282 (3d Cir.1975) ("Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the *Noerr-Pennington* doctrine is inapplicable.").

*Greenwood Utilities Commission v. Mississippi Power Co.*, 751 F.2d 1484 (5th Cir. 1985), we recently held that *Noerr-Pennington* extends to situations where the government enters into a contractual relationship with a private entity, at least in situations "where the government engages in a policy decision and at the same time acts as a participant in the marketplace." *Id.* at 1505 (footnote omitted). We expressly rejected the notion that *Noerr-Pennington*'s first amendment and statutory roots are not sympathetic to such agreements, even if they can be properly characterized as essentially "commercial." *Id.* at 1504–06; *cf. Mid-Texas Communications Systems, Inc. v. AT & T*, 615 F.2d 1372, 1382–84 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). Viewing the record in the light most favorable to appellants, the most that can be said is that Yellow secured from the City an exclusive concession whose anticompetitive effects stem primarily from a valid municipal, and vicariously state, policy. It would be anomalous to hold on the one hand that government can contract with private entities to effectuate valid, albeit anticompetitive, policies, while holding on the other hand that private entities cannot petition government to participate in the public endeavor. There is no such case as *Parker v. Noerr-Pennington*.[10] In more than one sense, Yellow was the vehicle through which the city implemented its vision of ground transportation at Intercontinental. If "the basic principle of *Noerr-Pennington* [is] that it is lawful to petition the government for anticompetitive action," *Greenwood Utilities*, 751 F.2d at 1506, then the federal antitrust laws cannot meter Yellow's conduct in this case. *See generally* 1 P. Areeda & D. Turner, *supra* note 9, ¶ 206d3.

The judgment of the district court is AFFIRMED.

---

**10.** As the facts of this case suggest, the *Parker* and *Noerr-Pennington* immunities are somewhat interrelated. We need not consider, however, whether the private appellee would have prevailed with equal ease on summary judgment if the City had not been exempt under *Parker*. In large part, the two doctrines remain mutually independent both in origin and in application.