John WOOLEN, et al., Plaintiffs,

v.

John D. Campisi, Individually and as Class Action Plaintiffs, et al., Plaintiffs-Appellants,

and

Carl Whorton, et al., Intervenors-Appellants,

v.

SURTRAN TAXICABS, INC., et al., Defendants-Appellees.

Ken WHORTON, et al., Plaintiffs-Appellants,

v.

CITY OF DALLAS, TEXAS, et al., Defendants-Appellees.

No. 85–1564.

United States Court of Appeals, Fifth Circuit.

Sept. 26, 1986.

Stan McMurry, Karen L. Fry, Morris Harrell, Dallas, Tex., for Surtran Taxicabs, Inc., et al.

Kent S. Hofmeister, Asst. City Atty., Dallas, Tex., for City of Dallas, Tex.

Don J. Rorschach, City Atty., Charles R. Anderson, Irving, Tex., for City of Irving, Tex.

Arthur Petersen, City Atty., Richard E. Henderson, Fort Worth, Tex., for City of Fort Worth, Tex.

Hutchison, Price, Boyle & Brooks, John F. Boyle, Jr., John M. Hill, Dallas, Tex., for City of Grapevine, Tex.

John F. Bass, John E. Kennedy, Bass & Martin, Dallas, Tex., for Carl Whorton, et al.

Kolodey, Thomas & Yeager, Tom Thomas, Dallas, Tex., for Campisi and Class Action plaintiffs, et al.

Robert F. Maris, Richard A. McKinney, Dallas, Tex., for John Woolen, et al.

Before GEE, RANDALL and DAVIS, Circuit Judges.

PER CURIAM:

We affirm the judgment of the district court on the basis of its careful opinion, 615 F.Supp. 344, which is attached as Appendix A.

AFFIRMED.

APPENDIX A

John Woolen, et al., Plaintiffs,

Vs.

Surtran Taxicabs, Inc., et al., Defendants.

Civ. A. Nos. 3–78–609, 3–78–745.

United States District Court, N.D. Texas, Dallas Division.

Aug. 8, 1985.

ORDER

MARY LOU ROBINSON, District Judge.

The factual allegations in these antitrust actions have already been reported twice

and need not be repeated at length here. See *Woolen v. Surtran Taxicabs,* 461 F.Supp. 1025 (N.D.Tex.1978) (denying motions to dismiss); *Woolen v. Surtran Taxicabs,* 684 F.2d 324 (5th Cir.1982) (vacating order denying intervention). In a nutshell, the plaintiff taxicab drivers claim that the defendants have excluded them from the outbound taxicab market at the Dallas/Fort Worth Regional Airport since the airport's opening in 1974, in violation of the Sherman Act.

Recent antitrust law developments, most notably passage of the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (Oct. 24, 1984) (to be codified in 15 U.S.C. § 35), and the recent decisions in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); and *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.,* 760 F.2d 607 (5th Cir.1985), now require that three issues be addressed, including one previously decided in the original district court opinion in this case:[1]

I. Should these consolidated actions be dismissed because the Defendants' challenged activities are immune from scrutiny under the antitrust laws by virtue of the state action exemption?

II. Should the Plaintiffs' claims under § 4 of the Clayton Act for damages, interest on damages, costs and attorney's fees against the defendant cities be dismissed under § 3 of the Local Government Antitrust Act of 1984?

III. Should the Plaintiffs' claims against the private taxi company defend-

ants be dismissed as barred under the *Noerr-Pennington* doctrine?

For the reasons set forth below, the Court answers each question in the affirmative.

## I.  The State Action Exemption

### A.  The Municipal Defendants

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court, relying on principles of federalism and state sovereignty, determined that the Sherman Act does not apply to the anticompetitive conduct of a state acting through its legislature. *Id.* at 350–51, 63 S.Ct. at 313. Thirty-five years later, the Court also held that municipalities are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). These actions were filed shortly after *City of Lafayette* was decided.

*City of Lafayette* did not completely prohibit municipalities from claiming the state action exemption. Instead, the plurality opinion suggested that the state action doctrine "exempts only anticompetitive conduct engaged in as an act of government ... [by a political subdivision of the state] pursuant to state policy to displace competition with regulation or monopoly public service." 435 U.S. at 413, 98 S.Ct. at 1136. The opinion went on to explain:

> This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense ... [A]n adequate state mandate for anticompeti-

---

**1.** After these actions were filed in 1978, all defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, each asserting the state action exemption. These motions to dismiss were denied in the original district court opinion, 461 F.Supp. at 1031–33. On May 24, 1985, the Court issued an Order stating that it would reconsider these motions in light of subsequent authority. All parties submitted new briefs. On June 28, 1985, the private defendants—Sur-

tran Taxicabs, Inc., Yellow Cab of Dallas, Inc., and Fort Worth Cab & Baggage Company, Inc. —moved for summary judgment under Rule 56, asserting the state action exemption and *Noerr-Pennington* immunity.

The issues concerning the Local Government Antitrust Act of 1984 were raised by the Court in an Order issued December 6, 1984. In response to that Order, each party filed papers addressing the applicability of the Act's provisions.

tive activities ... exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated that kind of action complained of."

435 U.S. at 419, 98 S.Ct. at 1139 (citation omitted). Finally, *"City of Lafayette* suggested, without deciding the issue, that it would be sufficient to obtain *Parker* immunity for a municipality to show that it acted pursuant to a 'clearly articulated and affirmatively expressed ... state policy' that was 'actively supervised' by the State." *Town of Hallie,* 105 S.Ct. at 1717, quoting *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135.

Considerable debate ensued over what would constitute an adequate articulation and expression of state policy, and what would constitute active supervision. In *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Court held that a home rule provision of the Colorado Constitution which allocated only the most general authority to municipalities to govern local affairs did not satisfy the clear articulation component of the state action test. The opinion also suggested that whether active supervision by the state of the anticompetitive conduct was required was an open question, despite the plurality opinion in *City of Lafayette.* 455 U.S. at 51–52, n. 14, 102 S.Ct. at 840–41, n. 14.

Noting that "[i]t is fair to say that our cases have not been entirely clear," 105 S.Ct. at 1720, the Court resolved much of the debate in *Town of Hallie.* A unanimous Court reiterated that the state action exemption applies whenever the state legislature has "clearly articulated and affirmatively expressed" a state policy to displace competition in the regulated area. *Id.* at 1719. The Court further held that "although compulsion affirmatively expressed may be the best evidence of state policy, it is by no means a prerequisite to a finding that a municipality acted pursuant to a clearly articulated state policy." *Id.* Finally, the Court concluded that the "active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Id.*

The Fifth Circuit has applied *Town of Hallie* in a case which is virtually indistinguishable from the instant actions. In *Independent Taxicab Drivers' Employees v. Greater Houston Transportation Co.,* 760 F.2d 607 (5th Cir.1985), the City of Houston had entered into a contract with the Greater Houston Transportation Corporation by which the City granted an exclusive concession over passenger service at Houston Intercontinental Airport. Two groups of taxicab owners and operators filed suit under the Sherman and Clayton Acts, seeking damages and injunctive relief from the City and its private contractor. The district court dismissed the complaint on defendants' motion for summary judgment, holding that the City was immune from antitrust scrutiny under the state action exemption and that the private contractor was immune under the *Noerr-Pennington* doctrine. The Fifth Circuit affirmed.

The Court's analysis focused on the relevant provision of the Texas Municipal Airport Act, which authorizes municipalities to establish and operate airports both within and without their boundaries. Article 46d–4 provides:

(a) In operating an airport ... such municipality may ... enter into contracts ... and other arrangement for a term not exceeding forty (40) years with any persons:

.　.　.　.　.

(2) conferring the privilege of supplying goods, commodities, things, services or facilities at such airport....

.　.　.　.　.

In each case the municipality may establish the terms and conditions and fix the charges, rentals or fees for the privileges or services....

Tex. Rev. Civ. Stat. Ann. art. 46d–4 (Vernon 1969). The Fifth Circuit said:

While the latter provision falls short of expressly mentioning the establishment of ground transportation services, the statute's broad phrasing is a strong indi-

cation of the state's desire to abdicate in favor of municipal prescience with regard to airport management.

This indication is all we require.... We think it ... clear that the City of Houston might deem it most efficient to confer the privilege of airport taxicab operation on a single company, and that such a decision is a logical or reasonable consequence of the state's broad allocation of authority to the City to run its own airport.

760 F.2d at 610–11. The Fifth Circuit also disposed of the question concerning the impact of Article 46d–7(c)—a major stumbling block in the first district court opinion in this case, *see* 461 F.Supp. at 1031:

Similarly, it is of limited significance that the statute authorizing municipal airport management states that the municipality's actions shall not be "inconsistent with, or contrary to, any Act of the Congress of the United States...." (Article 46d–7(c).] The relevant question is not whether the City has transgressed federal law, but whether the Sherman & Clayton Acts apply to the City at all.

760 F.2d at 612, n. 8.

Plaintiffs seek to distinguish *Independent Taxicab* on two grounds: (1) Houston Intercontinental is wholly owned and operated by the City of Houston, whereas the Dallas/Fort Worth Regional Airport is jointly owned and operated by the Cities of Dallas and Fort Worth, and (2) recent statutory amendments demonstrate that taxicab operations at jointly owned and operated airports were in a "regulatory void" until 1983.

The first argument is of no import. The Cities of Dallas and Fort Worth operate the airport through the Dallas/Fort Worth Regional Airport Board, a joint board created under § 14 of the Municipal Airport Act, Article 46d–14. That section provides, in relevant part:

(a) For the purposes of this Section, unless otherwise qualified, the term "public agency" includes municipality....

(b) Any two (2) or more public agencies may enter into agreements with each other for joint action pursuant to the provisions of this Act and any two or more municipalities are specially authorized to make such agreement or agreements as they may deem necessary for the joint ... operation of airports.... Concurrent action by ordinance, resolution or otherwise of the governing bodies of the participating public agencies shall constitute joint action....

(c) ... The joint board shall have power to plan, acquire, establish, develop, construct, enlarge, improve, maintain, equip, operate, regulate, protect and police any airport ... to be jointly acquired, controlled and operated, and such board may exercise on behalf of its constituent public agencies all the powers of each with respect to such airport....

The Regional Airport Board is designed as a mechanism for joint action. That the defendant cities in these actions operated through the Regional Airport Board on a jointly owned airport, instead of on their own on individually owned airports, does not affect their state action exemption. "[T]he state's desire to abdicate in favor of municipal prescience with regard to airport management" is equally clear in both instances. The decision to grant an exclusive airport taxicab franchise—to utilize the "single-operator concept," in the parlance of these actions—is a logical and reasonable consequence of the State's broad allocation of authority to cities to jointly acquire, own and operate municipal airports.

Defendants second argument is based on legislation passed in 1983. The Obstruction to Air Navigation Control and Taxicab Licensing Act, 1983 Tex. Gen. Laws, ch. 626, at 4015, amended § 14 of the Municipal Airport Act to provide that:

(d)(6) Taxicab Licensing.... [A] joint airport board ... shall have power to license taxicabs picking up passengers at or delivering passengers to the airport.

(7) Regulations. Any resolutions, rules, regulations, or orders of the joint airport board dealing with subjects authorized by Subdivision (65) of this subsection become effective only upon approval of the

governing bodies of the constituent public agencies.

Article 46d–14(d)(6)–(7) (Vernon Supp.1985). While this statute was not enacted until well after the bulk of the actions challenged in these suits, it is significant as an indication of state policy, particularly when read in conjunction with § 2 of the Municipal Airport Act Amendments of 1983, 1983 Tex. Gen. Laws, ch. 978, at 5322, which provides:

> Any and all contracts, leases, or other arrangements for the use or occupancy of airport property executed by joint boards created under the Municipal Airports Act (Article 46d–1 et seq., Vernon's Texas Civil Statutes), and all provisions thereof, and executed prior to the effective date of this Act, are hereby validated and confirmed and the same are fully effective and represent the lawful agreements and undertakings of joint boards in accordance with the terms thereof.

From these enactments, Plaintiffs draw the conclusion that no governmental entity had any power to regulate taxicab service at the airport until September of 1983. The opposite is true.

The amendment to § 14 of the Municipal Airport Act was designed to clarify the role of joint airport boards in regulating taxicab service at joint airports because of uncertainties that might have arisen from concurrent legislation which clarified the role of the Railroad Commission in establishing licensing requirements under the Motor Bus Act, Article 911a. See 1983 Tex. Gen. Laws, ch. 263, at 1161. This clarifying legislation does not suggest that no power to regulate existed before its enactment. The validating statute suggests just the opposite.

The plaintiffs' operations at the airport were limited because ground transportation service was provided by means of a single-operator concept. The Cities of Dallas and Fort Worth own the airport and, as noted above, operate it through the Dallas/Fort Worth Regional Airport Board. The Cities of Dallas and Fort Worth contracted with the Airport Board to provide ground transportation under the single-operator concept. To meet their obligations to the Board, the Cities of Dallas and Fort Worth formed an entity known as the D/FW Surtran System. The System then solicited bids for the provision of the taxicab component of the ground transportation services. Yellow Cab of Dallas and Fort Worth Cab & Baggage formed an entity known as Surtran Taxicab, Inc., which submitted the winning bid. The D/FW Surtran System then contracted with Surtran Taxicab, Inc., for the provision of taxicab service at the airport. The single-operator concept, then, originated in the first agreement between the Airport Board and the Cities of Dallas and Fort Worth. The 1983 validation statute confirms that, under state law, the single-operator concept was lawful.

For purposes of antitrust analysis, the validation statute itself, by validating and confirming the contracts in question, is an adequate indication of the state's desire to allow joint airport boards to displace competition through anticompetitive measures in the area of taxicab services to municipal airports.

The Court concludes that Plaintiffs' actions against the Cities of Dallas, Fort Worth, Grapevine and Irving should be dismissed because the challenged conduct is immune from scrutiny under the antitrust laws by virtue of the state action exemption.

## B. The Private Defendants

In a companion case to *Town of Hallie*, the Supreme Court outlined the criteria a private party must satisfy to fall within the state action exemption. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy.' Second, the State must supervise actively any private anticompetitive conduct." *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985) (citations omitted). The Court explained the reason for extending the state action exemption to private parties:

The *Parker* decision was premised on the assumption that Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate domestic commerce. If *Parker* immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated, for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such programs merely by filing suit against the regulated private parties, rather than the state officials who implement the plan. We decline to reduce *Parker's* holding to a formalism that would stand for little more than the proposition that Porter Brown sued the wrong parties.

*Id.* at 1726–27. Instead, "[t]he success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the defendant." *Id.* at 1728.

The private defendants have met the first prong of the test. As discussed above, the single-operator concept resulted from the state's clearly articulated and affirmatively expressed "desire to abdicate in favor of municipal prescience with regard to airport management." 760 F.2d at 610. Because the Cities of Dallas and Fort Worth determined that the single-operator concept would be used at the airport and solicited bids only on this basis, it is fair to say that the private defendants, who simply submitted a bid, were compelled to participate in the anticompetitive activity if they wanted to provide taxicab service at the airport. As the Court said in *Southern Motor Carriers*, "compulsion often is the best evidence that the State has a clearly articulated and affirmatively expressed policy to displace competition." 105 S.Ct. at 1729.

The active supervision requirement—the second prong of the test—"prevents the state from frustrating the national policy in favor of competition by casting a 'gauzy cloak of state involvement' over what is essentially private anticompetitive con-

duct." *Id.* at 1729, quoting *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). "[T]he state supervision requirement is intended to control the potential for abuse created by authorizing private persons to make anticompetitive decisions and to insure that those decisions are consistent with the clearly articulated and affirmatively expressed state policy at stake." *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1014 (8th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985).

*Midcal* involved a challenge to a California wholesale wine pricing system that the Court found resulted in a de facto resale price maintenance program. The Court held that the system was a clearly articulated state policy, but that it did not meet the active supervision requirement:

The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any "pointed reexamination" of the program.

445 U.S. at 105–06, 100 S.Ct. at 943.

In the instant actions, there is no doubt that the Cities of Dallas and Fort Worth, and the Regional Airport Board, have actively supervised the private defendants' conduct. The details of taxicab service at the airport are set forth comprehensively in the contracts between D/FW Surtran System and Surtran Taxicabs, Inc., attached to the complaints. Further, the successive contracts show a gradually changing approach to ground transportation at the airport. For example, the 1979 Contract allows Surtran Taxicabs to subcontract with other taxicab companies for provision of service at the airport.

The Court concludes that the Plaintiffs' actions against the private defendants should be dismissed because the challenged conduct is immune from scrutiny under the

antitrust laws by virtue of the state action exemption.

### II. The Local Government Antitrust Act of 1984

The second question before the Court is whether the plaintiffs' claims for damages, interest on damages, costs and attorney's fees against the cities should, in the alternative, be dismissed under § 3 of the Local Government Antitrust Act of 1984, Pub.L. No. 98–544, 98 Stat. 2750 (Oct. 24, 1984) (to be codified in 15 U.S.C. § 35), which provides:

(a) No damages, interest on damages, costs or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity.

(b) Subsection (a) shall not apply to cases commenced before the effective date of this Act unless the defendant establishes and the court determines, in light of all the circumstances, including the stage of litigation and the availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any stage of litigation subsequent thereto, shall be deemed to be prima facie evidence that subsection (a) shall not apply.

Section 3(b) of the Act "was a compromise between those Congressmen who thought that retroactive application was not in accord with Congress' traditional approach to changing existing law and those who felt that denial of retroactive application would unjustly penalize those localities that were defendants in pending suits for treble damages." *Jefferson Disposal Co. v. Parish of Jefferson*, 603 F.Supp. 1125, 1131 (E.D.La.1985).

There is no dispute that these cases were commenced before the effective date of the act and that the cities of Dallas, Fort Worth, Grapevine and Irving are local governments within the meaning of § 2(1)(A) of the Act, 15 U.S.C. § 34(1)(A). The question, then, is whether it would be inequitable not to apply § 3(a) retroactively on the facts of these cases.

The Joint Explanatory Statement of the Conference Committee, which accompanied the Conference Report on the Bill, discusses the application of the Act to pending cases:

The application to pending cases of the money damage protection afforded by § 3 will be based upon a case-by-case determination by the district court. The local government has the burden of proof to establish to the court's satisfaction that it would be inequitable not to apply this Act to the pending case. The court is to consider all relevant circumstances. The statute mentions two of the factors that the court should consider—stage of litigation and the availability of alternative relief under the Clayton Act. Where a pending case is in an early stage of litigation and where injunctive relief can remedy the problem, the defendant local government may be able more easily to sustain its burden. Where a case is in more advanced stages of litigation or where injunctive relief is unavailable or incomplete, the burden would become more difficult. If a case has progressed to or beyond a jury verdict or district court judgment, a local government defendant would need compelling equities on its side to justify the application of this section to the pending case.

Conference Report of H.R. 6027, 98th Cong., 2d Sess., 130 Cong.Rec. H11,850–51 (daily ed. Oct. 10, 1984). "This Statement makes clear that as either of the two factors specifically mentioned in § 3(b) of the Act (stage of litigation and availability of alternative relief under the Clayton Act) moves towards weighing against retroactive application, the defendant's burden to establish that denial of such application would be inequitable becomes more difficult." *Jefferson Disposal*, 603 F.Supp. at 1132.

In addition to the two factors listed in the statute—the stage of the litigation and

the availability of alternative relief under the Clayton Act—the legislative history indicates that the Court should expressly consider at least three other factors in deciding the equity question:

> In making its determination as to whether a local government should be protected against damages in a currently pending case, however, the statement of managers specifically directs the court to consider all relevant circumstances, including the stage of litigation and the availability of alternative relief under the Clayton Act—that is, the injunction remedy. But public policy requires that the court's inquiry in such instances must not be limited solely to antitrust considerations in cases brought against local governments. Among the other relevant factors, the court should properly consider:
>
> First, whether the local government was acting within its normal legislative, regulatory, executive, administrative, or judicial authority;
>
> [S]econd, the financial harm which a treble damage award could inflict on the municipality and its taxpayers; and
>
> [T]hird, whether the municipal action was predicated on or in furtherance of Federal or State laws, policies or regulations.

130 Cong.Rec. H12,187 (daily ed. Oct. 11, 1984) (remarks of Rep. Fish). *Accord, id.* at H12,184 (remarks of Rep. Lungren). *But see id.* at S14,368 (remarks of Sen. Metzenbaum), *reprinted in Miami International Realty Co. v. Town of Mt. Crested Butte,* 607 F.Supp. 448, 452 n. 2 (D.Colo. 1985) (additional factors suggested on the House floor do not reflect Congressional intent). The Court will consider the statutory factors first, then those suggested by the legislative debates.

*The Stage of Litigation.* This litigation is now seven years old, but chronological age is deceptive in this instance. These suits were filed in May and June of 1978. The initial motions to dismiss were filed on November 29, 1978. Discovery then went forward on the class certification issues, and on the merits from February, 1979, forward. The class certification hearing was held on October 1979. The Court's ruling on class certification was issued December 31, 1980. Both cases were essentially dormant during the period the Court had the class certification issues under advisement.

The December 31, 1980, Order also denied the motion to intervene in the *Campisi (Woolen)* suit, which had been filed by some of the *Whorton* plaintiffs. Those plaintiffs appealed in January 1981. The Fifth Circuit's opinion was issued on August 30, 1982. The mandate was filed in the district court on September 27, 1982. No proceedings, other than those related to the appeal, took place during the pendency of the appeal.

After this case was remanded, the *Campisi* plaintiffs moved to modify the class certification order to certify a damages class and the *Whorton* plaintiffs moved to decertify the class. All parties filed statements concerning the future course this litigation should take. In the ensuing 2½ years, though, no party has made any real effort to complete discovery and ready the case for trial on the merits.

The past 5½ years has not been devoted to preparation for trial on the merits. Completion of pretrial discovery would take at least another year. Because the status of these actions has not changed since the effective date of the Act, the Court need not determine whether the appropriate date for assessing the stage of the litigation is the date of this Opinion or the date the Act took effect, September 24, 1984—30 days before its date of enactment under § 6 of the Act. *See Jefferson Disposal,* 603 F.Supp. at 1132 n. 16.

The failure to complete pretrial discovery before the effective date of the Act is a significant indication that § 3(a) should be applied retroactively. *See* 130 Cong.Rec. H12,186 (daily ed. Oct. 11, 1984) (remarks of Rep. Hyde) (the fact that pretrial discovery has not been completed "is an important distinction between the first and second sentences of section 3(b) for pur-

poses of retroactive application"); *id.* at H12,187 (remarks of Rep. Rodino) (uncompleted pretrial discovery "is the essential difference made in the conference report between pending cases generally, and pending cases where a jury verdict or district court decision has been rendered.") Congressman Hyde and Rodino were floor managers for the Act. Their statements during the course of debate are particularly useful in determining Congress' intent. *Miami International Realty*, 607 F.Supp. at 452 n. 2. The failure to complete discovery before the effective date of the Act has particular weight where, as here, major discovery remains to be conducted.

*The Availability of Alternative Relief Under the Clayton Act.* "[I]n looking to the availability of alternative relief under the Clayton Act, the court would assess whether a plaintiff could recover damages from a private party and whether an injunction would be sufficient to halt continuing injury caused by an ongoing antitrust violation." 130 Cong.Rec. S13,105 (daily ed. Oct. 4, 1984) (remarks of Sen. Cranston). *Contra Miami International Realty*, 607 F.Supp. at 454 ("the potential damage liability of other defendants should not enter into the calculus used in determining whether to apply § 3 to pending cases").

Both criteria are met in these cases.[2] Each case has three defendants which are not local governments—Surtran Taxicabs, Yellow Cab of Dallas, and Fort Worth Cab & Baggage Co.—and which could be held liable for money damages, if not otherwise exempt from the antitrust laws.

Any continuing injury could be halted with injunctive relief prohibiting the cities from excluding the plaintiffs from the outbound taxicab market at the airport, or other appropriate prohibitions. "Injunctive remedies under § 16 [of the Clayton Act] may be as broad as necessary to ensure that 'threatened loss or damage' does not materialize or that prior violations do not recur." *International Telephone & Telegraph Corp. v. General Telephone &*

*Electronics Corp.*, 518 F.2d 913, 925 (9th Cir.1975).

*Exercise of Normal Regulatory Authority & Action in Furtherance of State Law.* As discussed in Part I of this Opinion, the cities were plainly exercising their normal regulatory authority and acting in furtherance of state law in their implementation of taxicab service at the airport.

*Financial Harm of a Treble Damages Award.* The combined actions seek actual damages of $7,000,000, which would be trebled to $21,000,000. Such an award inevitably would have an adverse impact even on these major cities, but they would not be crippled in their provision of services or forced into bankruptcy. The burden would also be shared by the three nonmunicipal defendants. The magnitude of any adverse consequences falls far short of those suggested as benchmarks in the House:

> [W]hether an adverse impact would be felt by the unit of local government and its residents because of the antitrust damage award ... is important because certainly we do not want the antitrust laws of our country to result in insolvency with respect to our local governments, nor to intrude in such a way on local government that we do not have people coming forth to serve on local government out of fear of potential antitrust suits.

130 Cong.Rec. H12,184 (daily ed. Oct. 11, 1984) (remarks of Rep. Lungren). At the same time, "[i]t cannot be denied that a judgment of that magnitude would have an adverse impact on any community in this country and would be totally at odds with the spirit and intent of the Act." *Jefferson Disposal*, 603 F.Supp. at 1135.

*Conclusion.* The Court determines, in light of all the circumstances, that it would be inequitable not be apply § 3(a) of the Local Government Antitrust Act of 1984, 15 U.S.C. § 35(a), to this case. Plaintiffs' claims under § 4 of the Clayton Act, 15 U.S.C. § 15, for damages, interest on dam-

---

**2.** As an alternative ground for dismissal, this analysis proceeds as though the state action exemption did not apply, thus making the availability of alternative relief a reality.

ages, costs, and attorney's fees against the Cities of Dallas, Fort Worth, Grapevine and Irving are dismissed on this additional ground. This dismissal does not affect Plaintiffs' claims for costs and attorney's fees under § 16 of the Clayton Act, 15 U.S.C. § 26, as the Act does not encompass them. *Jefferson Disposal,* 603 F.Supp. at 1133 n. 19.

Under the express language of § 4(b) of the Act, the relief provided to private litigants is not available to the private defendants in these actions because they were commenced before the effective date of the Act.

### III. Noerr-Pennington

The private defendants have moved for summary judgment on the ground that their activities are immune from antitrust scrutiny under the *Noerr-Pennington* doctrine. See *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

"The *Noerr-Pennington* doctrine provides an exception to antitrust liability enabling citizens or business entities to influence or to petition public officials to take official action that will harm or eliminate competition." *Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1566 (5th Cir.1984) (en banc), *petition for cert. filed.* The *Noerr-Pennington* doctrine stems from the First Amendment's guarantee of a right to assemble and petition the government. "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme, itself violative of the Sherman Act." *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593. As the Court later said:

> [I]t would be destructive of rights of association and of petition to hold that groups with common interest may not, without violating the antitrust laws, use the channels and procedures of state and

federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interest vis-a-vis their competitors." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972).

However, "a defendant cannot rely on *Noerr-Pennington* immunity when the activity to influence government action is a mere sham to hide what is essentially an attempt to interfere with a competitor's business." *Affiliated Capital,* 735 F.2d at 1567. This sham exception may manifest itself in a variety of ways. See *Coastal States Marketing v. Hunt,* 694 F.2d 1358, 1371 n. 42 (5th Cir.1983); ABA Antitrust Section, Antitrust Law Developments 615–18 (2d ed. 1984). The plaintiffs in the instant actions have not suggested what variety of the sham exception they believe is applicable here.

Recognizing that "[a petitioning party] should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for [governmental] relief is a significant motivating factor underlying [the petitioning activity]," the Fifth Circuit has said that the sham exception is initially established by a showing that the defendant's petitioning activity was "substantially" motivated by impermissible anticompetitive factors. If this showing is made, the defendant must demonstrate to the satisfaction of the trier of fact that the defendant's petitioning activity was "substantially" motivated by a hope of governmental relief. If the defendant discharges this burden, "[n]othing more is required to bring the case within the immunity." *Coastal States Marketing,* 694 F.2d at 1372 & n. 45.

The summary judgment record in this case discloses no genuine issue as to any facts material to determination of the *Noerr-Pennington* question. The undisputed facts demonstrate that the private defendants are entitled to summary judgment by virtue of the *Noerr-Pennington* doctrine. The same comments made by the Fifth Circuit in *Independent Taxicab* apply here:

Viewing the record in the light most favorable to [plaintiffs], the most that can be said is that [the private defendants] secured from the [Regional Airport Board] an exclusive concession whose anticompetitive effects stem primarily from a valid municipal, and vicariously state, policy. It would be anomalous to hold on the one hand that government can contract with private entities to effectuate valid, albeit anticompetitive, policies, while holding on the other hand that private entities cannot petition government to participate in the public endeavor.

760 F.2d at 613.

This result is compelled if *Noerr-Pennington* protection is to have meaning in the context of agreements with the government. First Amendment petitioning privileges would indeed be hollow if upon achieving a petitioned-for end the petitioner were then subjected to antitrust liability for his success.

*Greenwood Utilities Commission v. Mississippi Power Company,* 751 F.2d 1484, 1505 (5th Cir.1985).

The single-operator concept, which is at the heart of Plaintiffs' claims, apparently originated in an independent consultant's report prepared for the Cities of Dallas and Fort Worth in 1964. Even if the private defendants actively lobbied for implementation of the single-operator concept and vigorously pressed their views concerning criteria the successful bidder would have to meet in such areas as minimum insurance coverage and fleet size, *Noerr-Pennington* would apply because these activities plainly were not a sham. Plaintiffs' alleged injuries were caused by the governmental action which the private defendants genuinely attempted to secure and succeeded in securing. *See In re Airport Car Rental Antitrust Litigation,* 521 F.Supp. 568, 587–90 (N.D.Cal.1981), *aff'd,* 693 F.2d 84 (9th Cir.1982), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

Plaintiffs' contention that the private defendants' actions fall within the co-conspirator exception to the *Noerr-Pennington* doctrine is without merit. Viewing the summary judgment record in the light most favorable to plaintiffs, the most that has been shown is mere adoption by the cities of some of the private defendants' proposals. The record shows that while some of the private defendants' suggestions were adopted, the general concept and specific details of taxicab service at the airport were closely scrutinized and extensively debated by a variety of public and private entities. There is no evidence of a conspiracy. See *Affiliated Capital Corp. v. City of Houston,* 519 F.Supp. 991, 1016–23 (S.D. Tex.1981), *adopted in relevant part,* 735 F.2d at 1567 (applying co-conspirator exception where the evidence revealed "active participation and orchestration by public officials in an anticompetitive agreement").

The Court concludes that the plaintiffs' claims against the private defendants should also be dismissed as barred under the *Noerr-Pennington* doctrine.

### IV. The Civil Rights Claim

In their First Amended Complaint, filed May 17, 1985, the *Whorton* plaintiffs allege that the defendants' conduct constituted "a discrimination against the rights of the Plaintiffs under the Civil Rights Act and the Constitution of the United States." *Id.* ¶ 17, at 9. The *Whorton* plaintiffs have not further elaborated on this cause of action in any document filed with the Court, nor have they identified what statute they purport to sue under.

This alleged civil rights claim based on discrimination has no plausible foundation and is wholly insubstantial and frivolous. It is dismissed for want of subject matter jurisdiction. Rule 12(b)(1). *See Williamson v. Tucker,* 632 F.2d 579, 590–91 (5th Cir.1980) (discussion of applicable standards). In the alternative, the civil rights claim is dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6).

### V. Summary of Holdings

1. Plaintiffs' antitrust claims are DISMISSED because the Defendants' chal-

lenged activities are immune from scrutiny under the antitrust laws by virtue of the state action exemption.

2. Plaintiffs' antitrust claims under § 4 of the Clayton Act for damages, interest on damages, costs and attorney's fees against the Defendant cities are DISMISSED under § 3 of the Local Government Antitrust Act of 1984 because, in light of all the circumstances, it would be inequitable not to apply § 3(a) of the Act to this case.

3. Plaintiffs' antitrust claims against the private Defendants are DISMISSED as barred under the *Noerr-Pennington* doctrine.

4. The *Whorton* Plaintiffs' civil rights claim is DISMISSED for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

5. This Order disposes of all pending claims in this litigation. Judgment will be entered accordingly.

It is so ORDERED.